# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PLUMBERS' LOCAL UNION NO. 690 HEALTH PLAN,** **individually and on behalf of all others similarly situated** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ACTAVIS INC. a/k/a ACTAVIS U.S., INC., ACTAVIS ELIZABETH LLC, ACTAVIS KADIAN, LLC, ACTAVIS MID-ATLANTIC, LLC, ACTAVIS SOUTH-ATLANTIC, LLC, ACTAVIS TOTOWA, LLC f/k/a AMID PHARMACEUTICAL, INC., ABRIKA PHARMACEUTICALS, INC., ALPHARMA INC., ALPHARMA PHARMACEUTICALS INC. f/k/a FAULDING PHARMACEUTICALS, INC.; ALPHARMA BRANDED PRODUCTS DIVISION, INC., ALPHARMA USPD, INC., ALPHARMA USHP, INC., PUREPAC PHARMACEUTICAL CO., APOTEX CORP., DR. REDDY'S LABORATORIES LTD., ENDO PHARMACEUTICALS, INC., QUALITEST, BOCA PHARMACAL, GENERICS INTERNATIONAL , INC., FOREST LABORATORIES, INC., FOREST PHARMACEUTICALS, INC., INWOOD LABORATORIES, INC., HERITAGE PHARMACEUTICALS, INC., IMPAX LABORATORIES, INC., GLOBAL PHARMACEUTICAL CORPORATION, K-V PHARMACEUTICAL COMPANY, ETHEX CORPORATION, NESHER PHARMACEUTICALS, INC., THER-RX CORPORATION, LANNETT COMPANY, INC.,** | : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : | **Civil Action No. 16-00665-AB** |

**MYLAN LABORATORIES, INC. n/k/a MYLAN**                               :
**INC., MYLAN PHARMACEUTICALS, INC.,**                               :
**UDL LABORATORIES, INC., MYLAN**                               :
**TECHNOLOGIES, INC. f/k/a BERTEK INC.,**                               :
**PAR PHARMACEUTICAL COMPANIES, INC.,**                               :
**PAR PHARMACEUTICAL, INC.,**                               :
**STRATIVA PHARMACEUTICALS,**                               :
**RANBAXY, INC., RANBAXY**                               :
**PHARMACEUTICALS INC.,**                               :
**SANDOZ, INC., f/k/a GENEVA**                               :
**PHARMACEUTICALS, INC., APOTHECON,**                               :
**INC., EON LABS, INC., INVAMED, INC., SAB-**                               :
**PHARMA, INC.,**                               :
**SUN PHARMACEUTICAL INDUSTRIES, INC.,**                               :
**CARACO PHARMACEUTICAL**                               :
**LABORATORIES, LTD., URL PHARMA, INC.,**                               :
**MUTUAL PHARMACEUTICAL CO.,**                               :
**TEVA PHARMACEUTICALS USA, INC.**                               :
**NOVOPHARM USA INC., NOVAPHARM LTD.,**                               :
**TEVA NEUROSCIENCE, INC.,**                               :
**TEVA RESPIRATORY, LLC, TEVA WOMEN'S**                               :
**HEALTH, INC., f/k/a DURAMED RESEARCH,**                               :
**INC., COPLEY PHARMACEUTICALS, INC.,**                               :
**BARR PHARMACEUTICALS, INC.,**                               :
**BARR LABORATORIES, INC., DURAMED**                               :
**PHARMACEUTICALS, INC.,**                               :
**IVAX CORPORATION, IVAX**                               :
**PHARMACEUTICALS, INC., SICOR, INC. f/k/a**                               :
**SICOR PHARMACEUTICALS, INC., f/k/a**                               :
**GENSIA SICOR PHARMACEUTICALS, INC.,**                               :
**WATSON PHARMACEUTICALS, INC.,**                               :
**WATSON PHARMA, INC. f/k/a SCHEIN**                               :
**PHARMACEUTICALS, INC.,**                               :
**WATSON LABORATORIES, INC.,**                               :
**ANDRX CORPORATION a/k/a ANDRX**                               :
**PHARMACEUTICALS, INC.,**                               :
**WEST-WARD PHARMACEUTICAL CORP.,**                               :
**ZYDUS PHARMACEUTICALS USA, INC.**                               :
                               :
        **Defendants.**                               :
                               :

## AMENDED CIVIL CONSUMER CLASS ACTION COMPLAINT

ii

**TABLE OF CONTENTS**

**Page**

AMENDED CIVIL CONSUMER CLASS ACTION COMPLAINT ............................................1

I.  INTRODUCTION ............................................................................................................1
    A.  The 2004 Brand Name Prescription Drug Lawsuit................................................ 2
    B.  Congressional Investigation.................................................................................... 3
    C.  Pricing of Generic Drugs ....................................................................................... 6

II.  THE PARTIES, JURISDICTION AND VENUE ...........................................................8
    A.  Plaintiff .................................................................................................................8
    B.  Defendants .............................................................................................................9
        1.  Actavis ..................................................................................................... 9
        2.  Apotex Corp..........................................................................................  12
        3.  Dr. Reddy's Laboratories Ltd. ..............................................................  13
        4.  Endo Pharmaceuticals Inc. ...................................................................  14
        5.  Forest Laboratories, Inc. .......................................................................  15
        6.  Heritage Pharmaceuticals Inc. ..............................................................  16
        7.  Impax Laboratories, Inc. .......................................................................  18
        8.  K-V Pharmaceutical Company  .............................................................  19
        9.  Lannett Company, Inc. ..........................................................................  20
        10.  Mylan Laboratories, Inc. n/k/a Mylan Inc. ..........................................  22
        11.  Par Pharmaceutical Companies, Inc.  ....................................................  24
        12.  Ranbaxy Laboratories, Ltd. ..................................................................  26
        13.  Sandoz, Inc. ...........................................................................................  27
        14.  Sun Pharmaceutical Industries, Inc. .....................................................  29
        15.  Teva Pharmaceutical Industries, Ltd. ...................................................  31
        16.  Watson Pharmaceuticals, Inc. ..............................................................  33
        17.  West-Ward Pharmaceutical Corp.  ........................................................  35
        18.  Zydus Pharmaceuticals USA Inc.  ........................................................  36

III.  JURISDICTION AND VENUE  .................................................................................37

IV.  THE UNLAWFUL CONDUCT AT ISSUE ................................................................38
    A.  Reimbursement and Purchase of Prescription Drugs by the Plaintiff
        and the Class .......................................................................................................38
    B.  The Market for Prescription Drugs....................................................................... 39
        1.  Prescriber Dispensed Drugs ("PDDs") ................................................. 39
        2.  Pharmacy/Non-Prescriber Dispensed Drugs ("NPDDs") .................... 40
    C.  The Origin and History of AWP ..........................................................................41
    D.  Unlawful Acts and Practices of the Defendants  .................................................45
    E.  The Difference Between Brand and Generic Drugs  .............................................46

F.  Inflation of AWPs. ...............................................................................47
    1.  AWP inflation generally ............................................................ 47
    2.  Actavis Defendants' AWP Inflation ........................................... 49
    3.  Apotex's AWP Inflation ............................................................ 51
    4.  Dr. Reddy's AWP Inflation ....................................................... 52
    5.  Endo's AWP Inflation ............................................................... 53
    6.  Forest's AWP Inflation ............................................................. 54
    7.  Heritage's AWP Inflation .......................................................... 55
    8.  Impax's AWP Inflation ............................................................. 57
    9.  K-V's AWP Inflation ................................................................ 58
    10. Lannett's AWP Inflation ........................................................... 59
    11. Mylan Defendants' AWP Inflation ............................................ 60
    12. Par's AWP Inflation .................................................................. 62
    13. Ranbaxy's AWP Inflation ......................................................... 65
    14. Sandoz's AWP Inflation ........................................................... 66
    15. Sun's AWP Inflation ................................................................. 68
    16. Teva's AWP Inflation ............................................................... 69
    17. Watson's AWP Inflation ........................................................... 71
    18. West-Ward's AWP Inflation ..................................................... 73
    19. Zydus' AWP Inflation .............................................................. 74

G.  Creation and Promotion of Spreads ..............................................75

H.  Provision of Free Goods and Free Drug Products .........................76

I.  Other Financial Inducements .........................................................78

J.  Concealment and Suppression of Unlawful Conduct .....................79

V. FRAUDULENT CONCEALMENT AND TOLLING OF LIMITATIONS PERIOD ...........80

VI. CLASS ACTION ALLEGATIONS ...........................................................81
    A. Numerosity ...................................................................................82
    B. Typicality .....................................................................................82
    C. Common Questions of Law and Fact ............................................83
    D. Adequacy .....................................................................................84
    E. Superiority ....................................................................................84

VII. CLAIMS ...............................................................................................85

COUNT I
Violations of the Pennsylvania Unfair Trade Practices and
Consumer Protection Law .............................................................................85

COUNT II
Violations of Consumer Fraud Laws of the DVHCC Member States ............................. 88
    1.  Violations of California Business & Professions Code § 17200 *et seq.*
       ("The Unfair Competition Act") .................................................................90
    2.  Violations of the Delaware Consumer Fraud Act
       (6 Del. Code § 2511, *et seq.*) ...................................................................92
    3.  Violations of the District of Columbia Consumer Protection Procedures Act
       (D.C. Code § 28-3901, *et seq*) .................................................................93
    4.  Violations of the Indiana Deceptive Consumer Sales Act
       (Ind. Code Ann. § 24-5-0.5.1, *et seq.*) .....................................................94
    5.  Violations of Kentucky Consumer Protection Act
       (KRS 367.170) .........................................................................................96
    6.  Violations of the Maryland Consumer Protection Act
       (Md. Com. Law Code § 13-101, *et seq.*) ..................................................97
    7.  Violations of the Massachusetts Consumer Fraud Law
       (M.G.L.A 93A, §2, *et. seq.*)....................................................................98
    8.  Violations of the Michigan Consumer Protection Act
       (Mich. Stat. § 445.901, *et seq.*) .............................................................100
    9.  Violations of New Jersey Consumer Fraud Act
       (N.J. Stat. Ann. § 56:8-1, *et seq.*) .........................................................101
   10. Violations of New York General Business Law
       (N.Y. Gen. Bus. Law § 349, *et seq.*) .....................................................103
   11. Violations of Ohio's Consumer Sales Practices Act
       (Ohio Revised Code §1345.01 *et seq*) ....................................................104
   12. Violations of Wisconsin Consumer Fraud Law
       (Wis. Stat. § 100.18, *et seq.*) ................................................................105
   13. Violations of West Virginia's Consumer Credit and Protection Act
       (W. Va. Code § 46A-6-101, *et seq.*) .......................................................107

COUNT III
Violations of the Consumer Protection Laws of Other States .....................................109

COUNT IV
Negligent Misrepresentation/Fraud .........................................................................112

COUNT V
Unjust Enrichment ............................................................................................... 114

COUNT VI
Civil Conspiracy ..................................................................................................115

COUNT VII
Aiding and Abetting .............................................................................................118

COUNT VIII
AD DAMNUM .......................................................................................................120

<u>**AMENDED CIVIL CONSUMER CLASS ACTION COMPLAINT**</u>

Plaintiff, Plumbers' Local Union No. 690 Health Plan ("Local 690"), by and through its attorneys, brings this action on its own behalf, and on behalf of all others similarly situated, to obtain declaratory and injunctive relief, compensatory, punitive and other damages, and other statutory, civil, and equitable relief, as more fully set forth below.  Plaintiff alleges and avers as follows:

## I.   <u>INTRODUCTION</u>

1.     This case is brought by Plaintiff Local 690 on behalf of itself and a class of all similarly situated consumers and third party payors ("TPPs"), who, like Local 690, purchase or reimburse the cost of prescription drugs (the "Class").  Plaintiff and the Class have sued certain pharmaceutical companies who distribute, market, and sell generic prescription pharmaceutical drugs as described more fully below.

2.     This case is brought as a class action on behalf of the thousands of individuals and entities who overpaid as a result of the defendant generic drug companies' unfair and deceptive acts and practices which affected three types of healthcare patients: (1) "government assistance patients": those who are members of one or more government assistance programs which cover all or part of the cost of their generic prescription drugs, including Medicare, Medicaid, and PACE (hereinafter referred to collectively as "government assistance programs"); (2) "private assistance patients": those who are members of private health insurance plans offered by union funds and other self-funded TPPs for full or the partial payment of their generic prescription drugs; and (3) "no assistance patients": those who have no health insurance at all for the payment of their generic prescription drugs, and thus have to pay cash for their generic prescription drugs based upon inflated "average wholesale prices" (or "AWPs") for such drugs (as described more

1

fully below).  These patients, and the TPPs that provide them generic prescription drug benefits, all paid more for generic prescription drugs than they otherwise would have paid as a result of the unlawful conduct of the defendants named herein.

3.     This case does not concern the efficacy of the drugs sold by the defendants. Instead, the lawsuit seeks legal redress for the unfair and deceptive pricing, marketing and sales practices of the defendants, who have profited from their wrongful acts and practices at the expense of the Plaintiff and the Class.

### A.     The 2004 Brand Name Prescription Drug Lawsuit

4.     In 2004, shortly after a second brand name drug company, AstraZenenca, pled guilty to unlawful conduct involving the provision of free samples of cancer drugs for which providers (including, without limitation, doctors, nurses, nurse practitioners, physician assistants, residents, and others who provide medical care to patients), could bill, the Commonwealth of Pennsylvania, by and through the Office of the Attorney General and undersigned outside counsel, brought suit against thirteen brand name prescription drug company families.  The defendants included TAP Pharmaceuticals and AstraZeneca, two brand name drug companies that had been prosecuted criminally and civilly for the unlawful marketing and sales practices of inflating AWPs and promoting spreads  (hereinafter, the "2004 Brand Lawsuit").  Eleven of the thirteen defendants in the 2004 Brand Lawsuit chose to enter into voluntary consent decrees to settle with the Commonwealth.  They further agreed to provide, *inter alia*, their Average Manufacturer Prices ("AMPs") and average sales prices ("ASPs") to the Commonwealth for its use in setting reimbursements for brand name prescription drugs under certain conditions.

5.     The Commonwealth went to trial against the two brand name drug companies who chose not to settle, Bristol-Myers Squibb Company ("BMS") and Johnson & Johnson ("J&J").

Trial verdicts were entered against both of these companies for two violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). *See Com. v. TAP, et al.* 36 A. 3d 1197 (Cmmwlth. Ct. 2011); *Com. v. TAP, et al.*, 36 A. 3d 1112 (Cmmwlth. Ct. 2011). The Commonwealth Court found that the acts of BMS and J&J in causing inflated AWPS to be published, and in marketing "spreads" for their drugs based upon the inflated AWPs, were unfair and deceptive acts or practices within the meaning of the Pennsylvania UTPCPL.

6.      While the trial verdicts subsequently were vacated by a divided disposition of the Pennsylvania Supreme Court (for reasons not relevant to the claims against the generic drug companies in this case), the cases were remanded to Commonwealth Court for further proceedings. That Commonwealth Court reinstated its findings of liability against both companies for their willful violations of the UTPCPL based upon the evidence of proven practices of inflating the AWPs for their drugs, and marketing spreads for their drugs. On a second appeal, the Pennsylvania Supreme Court affirmed such findings.

7.      Thus, in Pennsylvania, it is unlawful for drug companies to either inflate the AWPs for their prescription drugs or to market the spreads for their prescription drugs, based upon inflated AWPs. Plaintiff and the Class allege that the generic drugs companies sued here have engaged in such practices in violation of Pennsylvania law, and the laws of the other states.

**B.      Congressional Investigation**

8.      In October 2014, Congress began to investigate why the prices of some common generic drugs have skyrocketed in recent years. Specifically, the Senate Subcommittee on Primary Health and Aging and the House Committee on Oversight and Government Reform, through Vermont Senator Bernie Sanders and Maryland Representative Elijah Cummings, respectively, announced that they were investigating why some generic drug prices have risen

hundreds to thousands of percent higher, putting tremendous strain on the coffers of already strained state budgets and on the pocketbooks of consumers and TPPs who rely on generic drugs to try to reduce costs compared to brand name drugs.

9.      In a joint letter dated October 16, 2014, Senator Sanders and Congressman Cummings wrote the Secretary of the U.S. Department of Health and Human Services ("HHS") "regarding recent staggering increases in the prices being charged for generic drugs, and to request the assistance of the Department of Health and Human Services in addressing this growing healthcare crisis." (A true and correct copy of the October 16, 2014 letter is attached hereto as Exhibit "A".)  They reported that "[p]rices for some generic drugs—which are used to treat everything from common medical conditions to life-threatening illnesses—have recently risen at alarming rates."  They noted that one trade association reported "at least eight generic drugs have increased in average market price by more than 400% in the six months between October 2013 and April 2014."  They further reported that the "rapidly increasing prices being charged for generic drugs is also directly affecting the budget(s) of…Medicaid" and is "affecting the pocketbooks and health of millions of Americans", such that "some patients are refusing to fill their prescriptions."  They urged the federal government to "act immediately and aggressively to address the increasing costs of these drugs."

10.     In response, on or about April 13, 2015, the inspector general of HHS agreed to investigate "whether the numbers and size of generic drug price increases have accelerated" in recent years.

11.     Several of the defendant drug companies named herein have disclosed that they received subpoenas from the Department of Justice regarding its investigation into generic drug pricing, including Mylan, Actavis and Lannett.  Lannett revealed that it and one of its senior sales

marketing executives have been served with grand jury subpoenas from the Eastern District of

Pennsylvania relating to a federal investigation of the generic pharmaceutical industry.  In

particular, the subpoenas sought production of documents and testimony relating to

communications with competitors in the sale of generic prescription drugs.

12.     Also in October 2014, Senator Sanders and Representative Cummings sent letters

to fourteen of the generic drug companies named as defendants herein, "request(ing) information

about the escalating prices" they have been charging for these drugs. *See* letters at Exhibits "B"

through "N" hereto. The legislators received no immediate response from any of the fourteen

generic drug companies.

13.     They then invited high-level officials from three of the companies, Pennsylvania-

based Lannett Company ("Lannett") and Teva Pharmaceutical Industries ("Teva"), and Illinois-

based Marathon Pharmaceuticals ("Marathon"), to appear before Congress and testify at hearings.

Specifically, they invited Arthur Bedrosian, President and CEO of Lannett, Erez Vigodman,

President and CEO of Teva, and Jeffrey Aronin, Chairman and CEO of Marathon, to appear.

None of them agreed to do so.

14.     Senator Sanders observed during the ensuing hearings that the prices of more than

1200 generic medications increased an average of more than 448 percent between July 2013 and

July 2014.  In fact, one analysis found that half of all generics sold through retailers became more

expensive over that time period.

15.     To try to combat the rising prices for generic drugs, Senator Sanders said he would

introduce a bill that would require generic drug manufacturers to pay a rebate to Medicaid similar

to the one already paid by brand name drug manufacturers.

16.     Separately, a coalition of Attorneys General from around the country, led by Vermont Attorney General Bill Sorrell, began to examine why the prices for generic drugs have skyrocketed.  Attorney General Sorrell contacted the Federal Trade Commission ("FTC") about the price increases and has reported that the FTC supports the states investigating the matter.

17.     In light of the overwhelming evidence of exorbitant price increases by certain generic drug companies since late 2013, which increases appear to have taken place at the same time in similar amounts, and the refusal of many of these companies to respond to direct government inquiries into the matter, this lawsuit seeks to protect consumers and TPPs, and to compensate them for the harm caused by such conduct.

## C.     <u>Pricing of Generic Drugs</u>

18.     The defendants named herein have used, and continue to use, methods, acts and practices declared unlawful under Section 3 of the Unfair Trade Practices and Consumer Protection Act , 73 P.S. §201-4 ("UTPCPL"), as well as the consumer fraud laws of other states.

19.     The above-described Congressional already has revealed that at least fourteen generic drug companies have raised their prices for generic drugs at virtually the same time, in parallel fashion, to the same exorbitant levels.

20.     For instance, defendants Lannett (based in Philadelphia, Pennsylvania), Global Pharmaceuticals (based in Chalfont, Pennsylvania) ("Global") and West-Ward Pharmaceutical (based in Eatontown, New Jersey) ("West-Ward") all raised their prices for generic digoxin (single tablet, 250mg) (which is used to treat irregular heartbeats and heart failure) from $0.11 in November 2012 to $1.10 in September 2014.  This represents an increase of 884%.

21.     Both Lannett and West-Ward were then joined by defendants Endo Pharmaceuticals Inc.  (based in Malvern, Pennsylvania) ("Endo"), Mylan, Inc. (based in

Cannonsburg, Pennsylvania)("Mylan"), Sun Pharmaceutical Industries (based in Cranbury, New Jersey) ("Sun"), Par Pharmaceutical (based in Woodcliff Lake, New Jersey) ("Par"), Actavis, PLC (based in Parsippany, New Jersey) ("Actavis"), and Heritage Pharmaceuticals (based in Eatontown, New Jersey) ("Heritage") in raising their prices for generic doxycycline hyclate (bottle of 500, 100mg tablets) (which is an antibiotic used to treat a variety of infections) from $20 in October 2013 to $1,849 in April 2014.  This represents an astounding increase of 8281% in just 6 months!

22.     The period between October 2013 to April 2014 would prove to be a very busy time for extraordinary generic drug price increases by the defendants.  Endo, West-Ward and Par all raised their prices for generic glycopyrrolate (box of 10  0.2mg/mL, 20 mL vials) (used to prevent irregular heartbeats during surgery) from $65 in October 2013 to $1,277 in April 2014. This represents a staggering increase of 2728% over the same 6 months.

23.     Defendants Endo, Mylan, Sun and Par all chose to join with defendants Teva (based in North Wales, Pennsylvania) and Dr. Reddy's Laboratories (based in Princeton, New Jersey) ("Dr. Reddy's") in raising their respective prices for generic divalproex sodium ER (bottle of 80, 500 mg tablets ER 24H) (used to prevent migraines and treat certain types of seizures) from $31 in October 2013 to $234 in April 2014.  This represents an increase of 736% in the same 6 months.

24.     Two Pennsylvania companies, Mylan and Teva, then joined with three New Jersey companies, Par, Dr. Reddy's and Zydus Pharmaceuticals ("Zydus") and one Florida company, Apotex Corp. (based in Weston, Florida) ("Apotex") in raising their respective prices for generic pravastatin sodium (bottle of 500, 10 mg tablets) (used to treat high cholesterol and to prevent

heart disease) from $27 in October 2013 to $196 in April 2014.  This represents an increase of 573% in the same 6 months.

25.      These price increases by multiple defendants in the same amounts, for the same drugs, over the same narrow time period, represent the sort of parallel pricing actions that do not typically occur in a competitive market where commodity products, like generic prescription drugs, are sold.  Instead, they are believed and therefore averred to be the product of coordination and/or concerted action on the part of the defendants.

26.      In his opening remarks before the Congressional Subcommittee on November 20, 2014, Representative Cummings highlighted "two fundamental principles" he believed were shared by all members of Congress.  "First, generic drugs are critically important to the American people...They account for 86% of all drugs dispensed in the United States…Second,…when drug companies increase the prices by hundreds or even thousands of percent – virtually overnight – we as members of Congress have an obligation to our constituents to find out why, and to determine what we can do to help the people we serve."

27.      Plaintiff Local 690 seeks to find out why the generic drug prices have been raised to such exorbitant levels, and to remedy the affects of such unlawful price increases and conduct described herein.

## II.      THE PARTIES, JURISDICTION AND VENUE

### A.      Plaintiff

28.      Plaintiff, Plumbers' Local Union No. 690 Health Plan ("Local 690"), resides in the Commonwealth of Pennsylvania, and maintains a principle place of business at 2791 Southampton Road, Philadelphia, Pennsylvania.

29.     During the time period alleged in this Complaint, Local 690 and its members, and the other members of the putative Class, have paid for and/or reimbursed for prescription drugs prescribed to their beneficiaries on the basis of the inflated Average Wholesale Prices ("AWPs") established by defendants for their drugs.

**B.     Defendants**

30.     The defendants named in this Complaint include all of their predecessor and successor entities and all their past and present component, subsidiary and affiliate entities, including any entity in which any Defendant has a controlling interest, who had any role in the unlawful conduct alleged herein.

The acts alleged in this Complaint to have been done by each of the defendants were authorized, ordered, done and/or ratified by their respective officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their respective business affairs.

**1.     Actavis**

31.     Actavis Group is a corporation with its headquarters at Dalshrauni 1, 200 Hafnarfjordur, Iceland.  The Actavis Group is the parent company to Actavis, Inc. and others as detailed herein.  Actavis, Inc., and the other U.S. subsidiaries of Actavis Group, are collectively referred to as "Actavis".

32.     Actavis Group has a controlling interest in all of its successor entities, subsidiaries and affiliate entities, which have a role in the unlawful conduct alleged herein.  At all times material herein, all acts committed by or on behalf of Actavis were also committed by or on behalf of its successor entities, subsidiaries and affiliate entities.  Actavis controls the AWPs, WACs, and/or Direct Prices for their drugs, as well as the design, assembly, packaging, labeling,

marketing, and advertising, even when manufactured, sold, and/or distributed by its successor entities, subsidiaries and affiliate entities.  As such, Actavis is also being sued for the conduct of its successor entities, subsidiaries and affiliate entities, including but not limited to the following, who are hereinafter collectively, referred to as "Actavis":

a.   Actavis, Inc., a/k/a Actavis U.S., Inc., is the U.S. subsidiary of the Actavis Group with its principal place of business located at 60 Columbia Road, Building B, Morristown, New Jersey.

b.   Actavis Elizabeth LLC is a subsidiary of Actavis with its principal place of business located at 200 Elmora Avenue, Elizabeth, New Jersey.

c.   Actavis Kadian, LLC is a subsidiary of Actavis with its principal place of business located at 60 Columbia Road, Building B, Morristown, New Jersey.

d.   Actavis Mid-Atlantic, LLC is a subsidiary of Actavis with its principal place of business located at 1877 Kawi Road, Lincolnton, North Carolina.

e.   Actavis South-Atlantic, LLC is a subsidiary of Actavis with its principal place of business located at 13800 Northwest 2nd Street, Suite 190, Sunrise, Florida.

f.   Actavis Totowa, LLC, formally known as Amid Pharmaceutical, Inc., is a subsidiary of Actavis with its principal place of business located at 101 East Mail Street, Little Falls, New Jersey.

g.   Abrika Pharmaceuticals, Inc. was a U.S. based generic pharmaceutical company that was acquired by Actavis in 2007.

h.   Alpharma, Inc. was a global specialty pharmaceutical company and a Delaware corporation with its principal place of business in New Jersey ("Alpharma"). In or about December 2005, the generics business of Alpharma became part of Actavis.  Alpharma continued to sell branded drugs through its subsidiaries, including Alpharma Pharmaceuticals LLC located at One New England Ave, Piscataway, New Jersey.

i.   Alpharma Pharmaceuticals Inc. manufactures and sells pharmaceutical products, including products in the chronic pain department, like Kadian. The company was incorporated in 1998 and is based at One New England Ave, Piscataway, New Jersey.  It was formally known as Faulding Pharmaceuticals Inc, and changed its name in 2003 to Alpharma

Pharmaceuticals Inc.  The company currently operates as a subsidiary of King Pharmaceuticals, Inc.

j.      Alpharma Branded Products Division, Inc. was a Delaware corporation and a subsidiary of Alpharma with its principal place of business located at 1 New England Avenue, Piscataway, New Jersey.

k.      Alpharma USPD, Inc., was a subsidiary of Alpharma with its principal place of business located in Baltimore, Maryland.

l.      Alpharma USHP, Inc. was a Delaware corporation and a subsidiary of Alpharma with its principal place of business located in Baltimore, Maryland.

m.      Purepac Pharmaceutical Co. was a corporation with its principal place of business located in Cranford, New Jersey, and Purepac Pharmaceutical Holdings, Inc. was a Delaware corporation (collectively "Purepac").  In or about December of 2001, Alpharma USPD acquired Purepac, and Purepac was then acquired by Actavis in or about December 2005.

33.     Actavis, individually and by and through their predecessors, successors, subsidiaries and affiliates, engage in the business of manufacturing, distributing, pricing, marketing and selling prescription drugs purchased and/or reimbursed by Plaintiff and the Class.

34.     The drugs of Actavis at issue in this action include drugs under Actavis' labeler codes that have inflated AWPs.  A labeler code is a 4 or 5 digit number assigned by the Food and Drug Administration ("FDA") as part of the drug application process.   A labeler is any firm that manufactures, repacks or distributes a drug product.

35.     Upon information and belief, Actavis manufactures, distributes, prices, markets, and sells pharmaceutical drugs under labeler codes 00228, 00472, 00585, 00591,  23317, 45963, 46987, 52152,  63857, and 67767 (for products purchased by King from Aventis), among others. It is alleged that generic pharmaceutical drugs under such labeler codes were priced, marketed and sold in the unlawful manner alleged herein, and therefore constitute the "Subject Drugs" named herein.

11

36.     For example, the generic drug described above, doxycycline hyclate, which experienced a price increase of 8,281%, has a labeler of 00591, demonstrating that it was sold by Actavis.

37.     The CEO of Actavis, Brent Saunders (formerly an executive of Schering Plough Corp.), received a letter from Congress in October 2014 concerning Congress' investigation into the "dramatic increase in generic drug prices", including the pricing for Actavis' doxycycline hyclate.  A true and correct copy of the letter to Mr. Saunders is attached hereto as Exhibit "B".  Mr. Saunders failed to respond to Congress' inquiry about Actavis' conduct in relation to the pricing, marketing and sales of its generic drugs.

### 2.     Apotex Corp.

38.     Apotex Corp. ("Apotex") is a corporation with its headquarters at 2400 North Commerce Parkway, Suite 400, Weston, Florida 33326.

39.     Apotex, individually and by and through its predecessors, successors, subsidiaries, and affiliates, engages in the business of manufacturing, distributing, pricing, marketing and selling prescription drugs purchased and/or reimbursed by Plaintiff and the Class.

40.     The drugs of Apotex at issue in this action include drugs under Apotex labeler codes that have inflated AWPs.

41.     Upon information and belief, Apotex manufactures, distributes, prices, markets, and sells pharmaceutical drugs under labeler codes 16651, 27444, 49856, 49867, 60505, and 64608, among others.  It is alleged that generic pharmaceutical drugs under such labeler codes were priced, marketed, and sold in the unlawful manner alleged herein, and therefore constitute "Subject Drugs".

42.     For example, the generic drug described above, pravastatin sodium, which experienced a price increase of 573%, has a labeler of 60505, demonstrating that it was sold by Apotex.

43.     The President of Apotex, Jeffrey Watson, received a letter from Congress in October 2014 concerning Congress' investigation into the "dramatic increase in generic drug prices", including the pricing for Apotex's pravastatin sodium.  A true and correct copy of the letter to Mr. Watson is attached hereto as Exhibit "C".  Mr. Watson failed to respond to Congress' inquiry about Apotex's conduct in relation to the pricing, marketing and sales of its generic drugs.

### 3.      Dr. Reddy's Laboratories Ltd.

44.     Dr. Reddy's Laboratories Ltd. ("Dr. Reddy's") is a corporation with its headquarters at 107 College Road East, Princeton, New Jersey 08540.

45.     Dr. Reddy's, individually and by and through its predecessors, successors, subsidiaries, and affiliates, engages in the business of manufacturing, distributing, pricing, marketing and selling prescription drugs purchased and/or reimbursed by Plaintiff and the Class.

46.     The drugs of Dr. Reddy's at issue in this action include drugs under Dr. Reddy's labeler codes that have inflated AWPs.

47.     Upon information and belief, Dr. Reddy's manufactures, distributes, prices, markets, and sells pharmaceutical drugs under labeler codes 30007, 43598, 55111, 55359, and 68001 among others.  It is alleged that generic pharmaceutical drugs under such labeler codes were priced, marketed, and sold in the unlawful manner alleged herein, and therefore constitute "Subject Drugs".

48.     For example, the generic drug described above, pravastatin sodium, which experienced a price increase of 573%, has a labeler of 55111, demonstrating that it was sold by

Dr. Reddy's.  Similarly, the generic drug described above, divalproex sodium ER, which experienced a price increase of 736%, has the same labeler of 55111, demonstrating that it was sold by Dr. Reddy's.

49.     The Head of North America Generics of Dr. Reddy's as of 2013, Umang Vohra, received a letter from Congress in October 2014 concerning Congress' investigation into the "dramatic increase in generic drug prices", including the pricing for Dr. Reddy's divalproex sodium and pravastatin sodium.  A true and correct copy of the letter to Mr. Vohra is attached hereto as Exhibit "D".  Mr. Vohra failed to respond to Congress' inquiry about Dr. Reddy's conduct in relation to the pricing, marketing and sales of its generic drugs.

### 4.     Endo Pharmaceuticals Inc.

50.     Endo International plc is a corporation with its U.S. headquarters at Endo US Headquarters, 1400 Atwater Drive, Malvern, Pennsylvania 19355.  Endo International operates at this address through Endo Pharmaceuticals, Inc. ("Endo").

51.     Qualitest, which joined Endo in 2010, is an Endo company focused on selling generic drugs.  In August 2013, Endo announced that Qualitest acquired privately held Boca Pharmacal ("Boca"), a specialty generics company located in Coral Springs, Florida.  Previously, in about October 2011, Boca obtained FDA approval to sell generic glycopyrrolate.

52.     Generics International (U.S.Parent), Inc. was incorporated in 2007 and is based in Huntsville Alabama ("Generics International").  Generics International operates as a subsidiary of Endo International plc.

53.     Endo Pharmaceuticals, Qualitest, Boca and Generics International are collectively referred to herein as "Endo".

54. Endo, individually and by and through its predecessors, successors, subsidiaries, and affiliates, engages in the business of manufacturing, distributing, pricing, marketing and selling prescription drugs purchased and/or reimbursed by Plaintiff and the Class.

55. The drugs of Endo at issue in this action include drugs under Endo labeler codes that have inflated AWPs.

56. Upon information and belief, Endo manufactures, distributes, prices, markets, and sells pharmaceutical drugs under labeler codes 00603, 60951, 63481, 64376 and 67979, among others. It is alleged that generic pharmaceutical drugs under such labeler codes were priced, marketed, and sold in the unlawful manner alleged herein, and therefore constitute "Subject Drugs".

57. For example, the generic drug described above, glycopyrrolate, which experienced a price increase of 2728% after Endo/Qualitest acquired Boca, has a labeler of 64376, demonstrating that it was sold by Endo.

58. The President of Endo, Brian Lortie, received a letter from Congress in October 2014 concerning Congress' investigation into the "dramatic increase in generic drug prices", including the pricing for Endo's glycopyrrolate, as well as divalproex sodium and doxyclycline hyclate. A true and correct copy of the letter to Mr. Lortie is attached hereto as Exhibit "E". Mr. Lortie failed to respond to Congress' inquiry about Endo's conduct in relation to the pricing, marketing and sales of its generic drugs.

### 5. Forest Laboratories, Inc.

59. Forest Laboratories, Inc. is located at 909 Third Avenue, New York, New York.

60. Forest Laboratories, Inc. has a controlling interest in all of its successor entities, subsidiaries and affiliate entities, which have a role in the unlawful conduct alleged herein. At all

times material herein, all acts committed by or on behalf of Forest Laboratories, Inc. were also committed by or on behalf of its successor entities, subsidiaries and affiliate entities.  Forest Laboratories, Inc. controls the AWPs, WACs, and/or Direct Prices for their drugs, as well as the design, assembly, packaging, labeling, marketing, and advertising, even when manufactured, sold, and/or distributed by its successor entities, subsidiaries and affiliate entities.  As such, Forest Laboratories, Inc. is also being sued for the conduct of its successor entities, subsidiaries and affiliate entities, including but not limited to the following, who are all hereinafter collectively referred to as "Forest":

> a.   Forest Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business located at 13600 Shoreline Drive, St. Louis, Missouri.
>
> b.   Inwood Laboratories, Inc., is a wholly-owned subsidiary of Forest with its principal place of business located at 500 Commack Road, Commack, New York.

61.     Forest, individually and by and through its predecessors, successors, subsidiaries, and affiliates, engage in the business of manufacturing, distributing, pricing, marketing and selling prescription drugs purchased and/or reimbursed by Plaintiff and the Class.

62.     The drugs of Forest at issue in this action include drugs under Forest's labeler codes that have inflated AWPs.

63.     Upon information and belief, Forest manufactures, distributes, prices, markets, and sells pharmaceutical drugs under labeler codes, 00258, 00456, and 10418 among others.  It is alleged that pharmaceutical drugs under such labeler codes were priced, marketed, and sold in the unlawful manner alleged herein, and therefore constitute "Subject Drugs".

### 6.     Heritage Pharmaceuticals Inc.

64.     Heritage Pharmaceuticals Inc. was formed in 2006 and is a corporation with its headquarters at 12 Christopher Way, Suite 300 Eatontown, New Jersey 07724 ("Heritage").

16

65.     Heritage, individually and by and through its predecessors, successors, subsidiaries, and affiliates, engages in the business of manufacturing, distributing, pricing, marketing and selling prescription drugs purchased and/or reimbursed by Plaintiff and the Class.

66.     The drugs of Heritage at issue in this action include drugs under Heritage's labeler codes that have inflated AWPs.

67.     Upon information and belief, Heritage manufactures, distributes, prices, markets, and sells pharmaceutical drugs under labeler code 23155, among others.  It is alleged that generic pharmaceutical drugs under such labeler codes were priced, marketed, and sold in the unlawful manner alleged herein, and therefore constitute "Subject Drugs".

68.     For example, the generic drug described above, doxycycline hyclate, which experienced a price increase of 8,281%, has a labeler of 23155, demonstrating that it was sold by Heritage.  Further, the generic drug tetracycline has a labeler of 23155, demonstrating that it was sold by Heritage.  Tetracycline also is manufactured by defendants Teva (Ivax), Mylan,  Impax and Watson, and experienced perhaps the largest price increase during the period 2013-2014 – an increase from $0.05 to $8.59.  This represents an extraordinary price increase of over 17,714%!

69.     The President and CEO of Heritage, Jeffrey Glazer, received a letter from Congress in October 2014 concerning Congress' investigation into the "dramatic increase in generic drug prices", including the pricing for Heritage's doxycycline hyclate.  A true and correct copy of the letter to Mr. Glazer is attached hereto as Exhibit "F".  Mr. Glazer failed to respond to Congress' inquiry about Heritage's conduct in relation to the pricing, marketing and sales of its generic drugs.

7. **Impax Laboratories, Inc.**

70.     Impax Laboratories, Inc. ("Impax") is a corporation with its headquarters at 30831 Huntwood Ave., Haywood, California 94544.  Impax manufactures and sells both brand name and generic drugs throughout the United States.  Impax has a facility in Philadelphia that serves as the company's primary packaging facility for products produced both domestically and internationally.

71.     On December 14, 1999, Impax Laboratories completed a reverse merger with Global Pharmaceutical Corporation ("Global") in which the two companies formed a new organization called Impax Laboratories, Inc.  Global is a corporation and the generic drugs division of Impax, with its headquarters at 121 New Britain Boulevard, Chalfont, Pennsylvania 18914.  Impax utilizes the sales, marketing and distribution capabilities of Global in selling its generic drugs.

72.     Impax, individually and by and through their predecessors, successors, subsidiaries, and affiliates, engage in the business of manufacturing, distributing, pricing, marketing and selling prescription drugs purchased and/or reimbursed by Plaintiff and the Class.

73.     The drugs of Impax at issue in this action include drugs under labeler codes that have inflated AWPs.

74.     Upon information and belief, Impax manufactures, distributes, prices, markets, and sells pharmaceutical drugs under labeler codes 00115 and 64896, among others.  It is alleged that generic pharmaceutical drugs under such labeler codes were priced, marketed, and sold in the unlawful manner alleged herein, and therefore constitute "Subject Drugs".

75.     For example, the generic drug described above, digoxin, which experienced a price increase of 884%, has a labeler of 00115, demonstrating that it was sold by Impax.  Further, the

generic drug described above, dival proexsodium ER, which experienced a price increase of 736%, has a labeler of 64896, demonstrating that it was sold by Impax.

76.     Carole S. Ben-Maimon, M.D. was appointed President of Global in September 2011.  Previously, she served as senior vice-president of Qualitest, an Endo company (also named as a Defendant therein), and held executive positions with other defendants Barr and Teva.

77.     Dr. Ben-Maimon received a letter from Congress on or about October 2, 2014 concerning Congress' investigation into the "dramatic increase in generic drug prices", including the pricing for Global's digoxin.  A true and correct copy of the letter to Ms. Ben-Maimon is attached hereto as Exhibit "G".  Ms. Ben-Maimon failed to respond to Congress' inquiry about Global's conduct in relation to the pricing, marketing and sales of its generic drugs.  Instead, she resigned abruptly on October 22, 2014, citing non-specific "personal and family reasons" for her departure.  In her absence, the CEO of Impax, Fred Wilkinson, has not responded to Congress' letter on behalf of either Global or Impax.

### 8.     K-V Pharmaceutical Company

78.     K-V Pharmaceutical Company is a corporation with its corporate headquarters located at 2280 Schuetz Road, St. Louis, Missouri.

79.     K-V Pharmaceutical Company has a controlling interest in all of its successor entities, subsidiaries and affiliate entities, which have a role in the unlawful conduct alleged herein.  At all times material herein, all acts committed by or on behalf of K-V Pharmaceutical Company were also committed by or on behalf of its successor entities, subsidiaries and affiliate entities.  K-V Pharmaceutical Company controls the AWPs, WACs, and/or Direct Prices for their drugs, as well as the design, assembly, packaging, labeling, marketing, and advertising, even when manufactured, sold, and/or distributed by its successor entities, subsidiaries and affiliate

entities.  As such, K-V Pharmaceutical Company is also being sued for the conduct of its successor entities, subsidiaries and affiliate entities, including but not limited to the following, who are hereinafter collectively, along with K-V Pharmaceutical Company, referred to as "K-V":

    a.    Ethex Corporation is a former subsidiary of K-V Pharmaceutical Company with its principal place of business located at One Corporate Woods Drive, Bridgeton, Missouri.  It is believed that Ethex may have ceased operations sometime in 2012, with its parent K-V Pharmaceutical Company retaining all rights, including the marketing, and distribution and sale of former Ethex products.  Thus, Ethex products continue to be marketed and sold by K-V Pharmaceutical Company.

    b.    Nesher Pharmaceuticals, Inc. is a subsidiary of K-V Pharmaceutical Company with its principal place of business located at One Corporate Woods Drive, Bridgeton, Missouri.

    c.    Ther-RX Corporation is a wholly owned subsidiary of K-V Pharmaceutical Company with its principal place of business located at 2280 Schuetz Road, St. Louis, Missouri.

80.    K-V, individually and by and through their parents, predecessors, successors and affiliates, engage in the business of manufacturing, distributing, pricing, marketing, and selling prescription drugs purchased and/or reimbursed by Plaintiff and the Class.

81.    The drugs of K-V at issue in this action include drugs under K-V's labeler codes that have inflated AWPs.

82.    Upon information and belief, K-V manufactures, distributes, prices, markets, and sells pharmaceutical drugs under labeler codes 00258, 00456, 10418 and, among others.  It is alleged that generic pharmaceutical drugs under such labeler codes were priced, marketed, and sold in the unlawful manner alleged herein, and therefore constitute "Subject Drugs".

### 9.    Lannett Company, Inc.

83.    Lannett Company, Inc. is a corporation with its headquarters at 12 Christopher Way, Suite 300 Eatontown, New Jersey 07724 ("Lannett").

84. Lannett, individually and by and through its predecessors, successors, subsidiaries, and affiliates, engages in the business of manufacturing, distributing, pricing, marketing, and selling prescription drugs purchased and/or reimbursed by Plaintiff and the Class.

85. The drugs of Lannett at issue in this action include drugs under Lannett labeler codes that have inflated AWPs.

86. Upon information and belief, Lannett manufactures, distributes, prices, markets, and sells pharmaceutical drugs under labeler code 00527, among others.  It is alleged that generic pharmaceutical drugs under such labeler code were priced, marketed, and sold in the unlawful manner alleged herein, and therefore constitute "Subject Drugs".

87. For example, the generic drug described above, doxycycline hyclate, which experienced a price increase of 8,281%, has a labeler of 00527, demonstrating that it was sold by Lannett.   Another generic drug described above, digoxin, which experienced a price increase of 884%, also has a labeler of 00527, demonstrating that it was sold by Lannett.

88. The President and CEO of Lannett, Arthur Bedrosian, received a letter from Congress in October 2014 concerning Congress' investigation into the "dramatic increase in generic drug prices", including the pricing for Lannett's doxycycline hyclate and digoxin.  A true and correct copy of the letter to Mr. Bedrosian is attached hereto as Exhibit "H".  Mr. Bedrosian failed to respond to Congress' inquiry about Lannett's conduct in relation to the pricing, marketing and sales of its generic drugs.

89. Further, Mr. Bedrosian was personally invited to appear before Congress to testify about his company's conduct.  He declined to appear.

90. Congressman Cummings took great pains to point out, in his opening remarks in the November 20, 2014 congressional hearing, that Mr. Bedrosian chose to speak to London-

21

based potential investors in Lannett, rather than Congress on the day he was called to testify.  He reported that Mr. Bedrosian told these investors that his company had just recorded its highest net sales, its highest gross margin, and its highest net income in their entire 72-year history.  With respect to cardiovascular drugs in particular, the company boasted that their earnings rose from $4.5 million to $66.9 million in a matter of months.  Mr. Bedrosian attributed these dramatic profits to their decision to raise prices on 75% of their products.

91.    Significantly, the cardiovascular drug, digoxin, about which Congress observed an increase from 11 cents per tablet to $1.10 per tablet since 2012 – a greater than 1,000% increase – saw the market reduce from three manufacturers to two, including Lannett, in 2012.  Mr. Bedrosian had this to say: "We are an opportunistic company.  We see opportunities to raise prices.  Competitors drop out of products.  There are shortages in the marketplace that sometimes drives it."

## 10.    **Mylan Laboratories, Inc. n/k/a Mylan Inc.**

92.    Mylan Laboratories, Inc. n/k/a Mylan Inc. is a Pennsylvania corporation with its principal place of business at 1500 Corporate Drive, Suite 400, Canonsburg, Pennsylvania.

93.    Mylan Inc. has a controlling interest in all of its successor entities, subsidiaries and affiliate entities, which have a role in the unlawful conduct alleged herein.  At all times material herein, all acts committed by or on behalf of Mylan Inc. were also committed by or on behalf of its successor entities, subsidiaries and affiliate entities.  Mylan Inc. controls the AWPs, WACs, and/or Direct Prices for their drugs, as well as the design, assembly, packaging, labeling, marketing, and advertising, even when manufactured, sold, and/or distributed by its successor entities, subsidiaries and affiliate entities.  As such, Mylan Inc. is also being sued for the conduct

of its successor entities, subsidiaries and affiliate entities, including but not limited to the following, who are hereinafter collectively, along with Mylan Inc., referred to as "Mylan":

      a.      Mylan Pharmaceuticals, Inc. is a wholly-owned subsidiary of Mylan with its principal place of business at 780 Chestnut Ridge, Morgantown, West Virginia.

      b.      UDL Laboratories, Inc. ("UDL") is a wholly-owned subsidiary of Mylan with its principal place of business at 1718 Northrock Court, Rockford, Illinois.  Mylan acquired UDL in 1996.

      c.      Mylan Technologies, Inc. f/k/a/ Bertek Inc. ("Bertek") is a wholly-owned subsidiary of Mylan with its principal place of business at Research Triangle Park, North Carolina.  Mylan acquired Bertek in 1993, and renamed the company in 1999.

94.     Mylan, individually and by and through their parents, predecessors, successors and affiliates, engage in the business of manufacturing, distributing, pricing, marketing, and selling prescription drugs purchased and/or reimbursed by Plaintiff and the Class.

95.     The drugs of Mylan at issue in this action include drugs under Mylan's labeler codes that have inflated AWPs.

96.     Upon information and belief, Mylan manufactures, distributes, prices, markets, and sells pharmaceutical drugs under labeler codes 00378, 51079, 55160, 59490 and 62794 among others.  It is alleged that generic pharmaceutical drugs under such labeler codes were priced, marketed, and sold in the unlawful manner alleged herein, and therefore constitute "Subject Drugs".

97.     For example, five (5) generic drugs were identified by Congress in its preliminary investigation:  albuterol sulfate, benzenpril/hydrochlorothiazide, divalproex sodium ER, doxycycline hyclate, and provastatin sodium.  The average prices charged for these drugs increased by as much as 4,014, 90 percent for albuterol sulfate, 420% for benezepril/hydrochlorothiazide, 736% for divalproex sodium ER, 8,281% for doxycycline

23

hyclate, and 573% for provastatin sodium, respectively, from October 2013 to April 2014. These drugs have a labeler code of 00378, demonstrating they were sold by Mylan.

98.     The CEO of Mylan, Heather Bresch, received a letter from Congress in October 2014 concerning Congress' investigation into the "dramatic increase in generic drug prices", including the prices of Mylan's albuterol sulfate, benazepril/ hydrochlorothiazide, divalproex sodium ER, doxycycline hyclate, and provastatin sodium.  A true and correct copy of the letter to Ms. Bresch is attached hereto as Exhibit "J".  Ms. Bresch failed to respond to Congress' inquiry about Mylan's conduct in relation to the pricing, marketing, and sales of its generic drugs.

**11.     Par Pharmaceutical Companies, Inc.**

99.     Par Pharmaceutical Companies, Inc. is a corporation with its principal place of business located at One Ram Ridge Road, Spring Valley, New York.

100.     Par Pharmaceutical Companies, Inc. has a controlling interest in all of its successor entities, subsidiaries and affiliate entities, which have a role in the unlawful conduct alleged herein.  At all times material herein, all acts committed by or on behalf of Par Pharmaceutical Companies, Inc. were also committed by or on behalf of its successor entities, subsidiaries and affiliate entities.  Par Pharmaceutical Companies, Inc. controls the AWPs, WACs, and/or Direct Prices for their drugs, as well as the design, assembly, packaging, labeling, marketing, and advertising, even when manufactured, sold, and/or distributed by its successor entities, subsidiaries and affiliate entities.  As such, Par Pharmaceutical Companies, Inc. is also being sued for the conduct of its successor entities, subsidiaries and affiliate entities, including but not limited to the following, who are hereinafter collectively, along with Par Pharmaceutical Companies, Inc., referred to as "Par":

24

    a.    Par Pharmaceutical, Inc. is the generic drug division of Par with its principal place of business located at 300 Tice Boulevard, Woodcliff Lake, New Jersey.

    b.    Strativa Pharmaceuticals is the proprietary products division of Par.  In 2006, Par launched its Proprietary Products Division, which was renamed Strativa Pharmaceuticals.

101.    Par, individually and by and through their parents, predecessors, successors and affiliates, engage in the business of manufacturing, distributing, pricing, marketing, and selling prescription drugs purchased and/or reimbursed by Plaintiff and the Class.

102.    The drugs of Par at issue in this action include drugs under Par's labeler codes that have inflated AWPs.

103.    Upon information and belief, Par manufactures, distributes, prices, markets, and sells pharmaceutical drugs under labeler codes 10370 and 49884, among others.  It is alleged that generic pharmaceutical drugs under such labeler codes were priced, marketed, and sold in the unlawful manner alleged herein, and therefore constitute "Subject Drugs".

104.    For example, four (4) generic drugs sold by Par were identified by Congress in its preliminary investigation: divalproex sodium ER, doxycycline hyclate, glycopyrrolate, and pravastatin sodium.  The average prices charged for these drugs increased by as much as 736% for divalproex sodium ER, 8,281% for doxycycline hyclate, 2,728% for glycopyrrolate, and 573% for pravastatin sodium, respectively from October 2013 to April 2014.  These drugs have a labeler code of 00591, demonstrating that they were sold by Par.

105.    The CEO of Par, Paul V. Campanelli, received a letter from Congress in October 2014 concerning Congress' investigation into the "dramatic increase in generic drug prices", including the pricing for Par's divalproex sodium ER, doxycycline hyclate, glycopyrrolate, and pravastatin sodium.  A true and correct copy of the letter to Mr. Campanelli is attached hereto as

Exhibit "J".  Mr. Campanelli failed to respond to Congress' inquiry about Par's conduct in relation to the pricing, marketing and sales of its generic drugs.

### 12.   **Ranbaxy Laboratories, Ltd.**

106.   Ranbaxy Laboratories, Ltd. is a public company incorporated under India law with its global headquarters in Gurgaon, India.

107.   Ranbaxy Laboratories, Ltd. has a controlling interest in all of its successor entities, subsidiaries and affiliate entities, which have a role in the unlawful conduct alleged herein.  At all times material herein, all acts committed by or on behalf of Ranbaxy Laboratories, Ltd. were also committed by or on behalf of its successor entities, subsidiaries and affiliate entities.  Such companies control the AWPs, WACs, and/or Direct Prices for their drugs, as well as the design, assembly, packaging, labeling, marketing, and advertising, even when manufactured, sold, and/or distributed by its successor entities, subsidiaries and affiliate entities.  The below companies are collectively referred to as "Ranbaxy":

    a.    Ranbaxy, Inc. is incorporated in Delaware and is the United States subsidiary of Ranbaxy Laboratories, Ltd.  Ranbaxy, Inc. is headquartered in Princeton, New Jersey.

    b.    Ranbaxy Pharmaceuticals, Inc. is a wholly-owned subsidiary of Ranbaxy Laboratories, Ltd. which began marketing generic products in the United States in about 1998.  Ranbaxy Pharmaceuticals, Inc. is headquartered at 600 College Road East, Suite 2100, Princeton, New Jersey 08540.

108.   Ranbaxy, individually and by and through their predecessors, successors, subsidiaries, and affiliates, engages in the business of manufacturing, distributing, pricing, marketing and selling generic drugs purchased and/or reimbursed by Plaintiff and the Class.

109.   The drugs of Ranbaxy at issue in this action include drugs under Ranbaxy's labeler codes that have inflated AWPs.

110.    Upon information and belief, Ranbaxy manufactures, distributes, prices, markets, and sells pharmaceutical drugs under labeler codes 54907 and 63304.  It is alleged that generic pharmaceutical drugs under such labeler codes were priced, marketed, and sold in the unlawful manner alleged herein, and therefore constitute "Subject Drugs".

### 13.    Sandoz, Inc.

111.    Defendant, Sandoz, Inc., a wholly owned subsidiary of Novartis, and formerly known as Geneva Pharmaceuticals, Inc., is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Sandoz Inc.'s principal place of business is located at 506 Carnegie Center, Suite 400, Princeton, NJ 08540 and 2555 West Midway Blvd., Broomfield, Colorado.

112.    Sandoz, Inc. also maintains a place of business in Pennsylvania, at Fougere Pharmaceuticals, Inc., 5050 Suite Am Louis Drive, Mechanicsburg, PA and also in North Carolina at 4700 Sandoz Drive, Wilson NC and 630 Davis Drive, Durham, NC.

113.    Sandoz, Inc. has a controlling interest in all of its successor entities, subsidiaries and affiliate entities, which have a role in the unlawful conduct alleged herein.  At all times material herein, all acts committed by or on behalf of Sandoz, Inc. were also committed by or on behalf of its successor entities, subsidiaries and affiliate entities.  Sandoz, Inc. controls the AWPs, WACs, and/or Direct Prices for their drugs, as well as the design, assembly, packaging, labeling, marketing, and advertising, even when manufactured, sold, and/or distributed by its successor entities, subsidiaries and affiliate entities.  As such, Sandoz, Inc. is also being sued for the conduct of its successor entities, subsidiaries and affiliate entities, including but not limited to the following, who are hereinafter collectively, along with Sandoz, Inc., referred to as "Sandoz":

    a.  Apothecon, Inc., ("Apothecon") is a corporation with a principal place of business at 2555 West Midway Blvd., Broomfield, Colorado.  Apothecon was acquired by Sandoz from Bristol-Myers Squibb Company in 2005.

    b.  Eon Labs, Inc. ("Eon") is a corporation that merged with Sandoz in 2005, with its principle place of business at 506 Carnegie Center, Suite 400, Princeton, New Jersey.

    c.  Invamed, Inc. ("Invamed") is a corporation with its principal place of business at 2400 US Highway 130, Dayton, New Jersey.

    d.  SAB-Pharma, Inc. ("SAB") is a corporation with its principal place of business at 272 East Deerpath Road, Suite 350, Lake Forest, IL 60045.

114.    In 2003, Geneva Pharmaceuticals began operating under the Sandoz name and on December 1, 2003, Geneva officially became Sandoz.  Sandoz acquired Apothecon and Eon in 2001 and 2005, respectively.

115.    In December 1999, Geneva Pharmaceuticals, Inc., now Sandoz, purchased Invamed, Inc., which became Geneva Pharmaceuticals Technology Corp.  In August 2004, Sandoz' parent company purchased 100% Sabex, Inc./Sabex Holding Ltd.  SAB-Pharma, Inc., was the United States marketing arm of Sabex, Inc.

116.    Sandoz, individually and by and through their predecessors, successors, subsidiaries and affiliates, engage in the business of manufacturing, distributing, pricing, marketing and selling prescription drugs purchased and/or reimbursed by third party payors and consumers.

117.    The drugs of Sandoz at issue in this action include drugs under Sandoz's labeler codes that have inflated AWPs.  A labeler code is a 4 or 5 digit number assigned by the Food and Drug Administration ("FDA") as part of the drug application process.   A labeler is any firm that manufactures, repacks or distributes a drug product.

118.     Upon information and belief, Sandoz manufactures, distributes, prices, markets, and sells pharmaceutical drugs under labeler codes 00185, 00781, 43858, 54643, 61314, 66685, and 66758, among others.  It is alleged that generic pharmaceutical drugs under such labeler codes were priced, marketed and sold in the unlawful manner alleged herein, and therefore constitute "Subject Drugs".

### 14.     Sun Pharmaceutical Industries, Inc.

119.     Sun Pharmaceutical Industries, Inc., one of India's largest drug makers, is a corporation with its United States headquarters located at 270 Prospect Plains Road, Cranbury, New Jersey 08512.

120.     Sun Pharmaceutical Industries, Inc. has a controlling interest in all of its successor entities, subsidiaries and affiliate entities, which have a role in the unlawful conduct alleged herein.  At all times material herein, all acts committed by or on behalf of Sun Pharmaceutical Industries, Inc. were also committed by or on behalf of its successor entities, subsidiaries and affiliate entities.  Sun Pharmaceutical Industries, Inc. controls the AWPs, WACs, and/or Direct Prices for their drugs, as well as the design, assembly, packaging, labeling, marketing, and advertising, even when manufactured, sold, and/or distributed by its successor entities, subsidiaries and affiliate entities.  As such, Sun Pharmaceutical Industries, Inc. is also being sued for the conduct of its successor entities, subsidiaries and affiliate entities, including but not limited to the following, who are hereinafter collectively, along with Sun Pharmaceutical Industries, Inc., referred to as "Sun":

      a.     Caraco Pharmaceutical Laboratories, Ltd. ("Caraco") which was formerly known as United Research Laboratories, Inc., is located at 1150 Elijah McCoy Drive, Detroit, Michigan 48202.

      b.     Caraco acquired URL Pharma, Inc. ("URL Pharma") which was located at 1100 Orthodox Street, Philadelphia, PA 19124.  URL Pharma has a generic

drug subsidiary, Mutual Pharmaceutical Co. ("Mutual"), also based at 1100 Orthodox Street, Philadelphia, PA 19124.  URL Pharma was purchased by Takeda Pharmaceuticals, Ltd. in or about 2012, but was later re-sold to Sun Pharmaceutical Industries, Inc.

121.    Sun individually and by and through their parents, predecessors, successors, subsidiaries, and affiliates, engage in the business of manufacturing, distributing, pricing, marketing and selling prescription drugs purchased and/or reimbursed by Plaintiff and the Class.

122.    The drugs of Sun at issue in this action include drugs under Sun's labeler codes that have inflated AWPs.

123.    Upon information and belief, Sun manufactures, distributes, prices, markets, and sells pharmaceutical drugs under labeler codes 00677, 14508, 41616, 47133, 47335, 49708, 57664, and 62756, among others.  It is alleged that generic pharmaceutical drugs under such labeler codes were priced, marketed, and sold in the unlawful manner alleged herein, and therefore constitute "Subject Drugs".

124.    For example, the generic drug described above, divalproex sodium ER, which experienced a price increase of 736% in 6 months, has the labeler code of 62756 demonstrating that it was sold by Sun.

125.    The Managing Director of Sun, Dilip S. Shanghvi, received a letter from Congress in October 2014 concerning Congress' investigation into the "dramatic increase in generic drug prices", including the pricing of Sun's divalproex sodium ER, doxycycline hyclate, and albuterol sulfate.  A true and correct copy of the letter to Mr. Shanghvi is attached hereto as Exhibit "K". Mr. Shanghvi failed to respond to Congress' inquiry about Sun's conduct in relation to the pricing, marketing and sales of its generic drugs.

### 15.   Teva Pharmaceutical Industries, Ltd.

126.   Teva Pharmaceutical Industries, Ltd. is a corporation with its corporate headquarters located in Petach Tikva, Israel.

127.   Teva Pharmaceutical Industries, Ltd. has a controlling interest in all of its successor entities, subsidiaries and affiliate entities, which have a role in the unlawful conduct alleged herein.  At all times material herein, all acts committed by or on behalf of Teva Pharmaceutical Industries, Ltd. were also committed by or on behalf of its successor entities, subsidiaries and affiliate entities.  Teva Pharmaceutical Industries, Ltd. controls the AWPs, WACs, and/or Direct Prices for their drugs, as well as the design, assembly, packaging, labeling, marketing, and advertising, even when manufactured, sold, and/or distributed by its successor entities, subsidiaries and affiliate entities.  As such, Teva Pharmaceutical Industries, Ltd. is also being sued for the conduct of its successor entities, subsidiaries and affiliate entities, including but not limited to the following, who are hereinafter collectively, along with Teva Pharmaceutical Industries, Ltd., referred to as "Teva":

     a.   Teva Pharmaceuticals USA, Inc. is a wholly-owned subsidiary of Teva Pharmaceutical Industries, Ltd. with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania.

     b.   Novopharm USA Inc. was a subsidiary of Novopharm Ltd, with a last known location at 165 East Commerce Drive, Schaumberg, Illinois 60173. Novopharm Ltd. was acquired by Teva Pharmaceutical Industries, Ltd. in 2000, and is located at 30 Novopharm Court, Toronto, Ontario M1B 2K9.

     c.   Teva Neuroscience, Inc. is a subsidiary of Teva Pharmaceutical Industries, Ltd. and is located at 901 East 104th Street, Suite 900, Kansas City, Missouri 64131.

     d.   Teva Respiratory, LLC is a subsidiary of Teva Pharmaceutical Industries, Ltd. and is located at 650 Cathill Road, Sellersville, Pennsylvania 18960.

e.      Teva Women's Health, Inc., f/k/a/ Duramed Research, Inc. is a subsidiary of Teva Pharmaceutical Industries, Ltd. and is located at 1090 Horsham Road, North Wales, Pennsylvania 19454.

f.      Copley Pharmaceuticals, Inc. ("Copley") was acquired by Teva Pharmaceutical Industries, Ltd. in 1999 and is located at 25 John Road Street, 13th Floor, Canton, Massachusetts 02021.

g.      Barr Pharmaceuticals, Inc. ("Barr") became a wholly-owned subsidiary of Teva Pharmaceutical Industries, Ltd. in December 2008 and is located at 1090 Horsham Road, North Wales, Pennsylvania 19454.

h.      Barr Laboratories, Inc. was a subsidiary of Barr and was last located at located at 1090 Horsham Road, North Wales, Pennsylvania 19454.

i.      Duramed Pharmaceuticals, Inc., ("Duramed") was acquired by Barr Pharmaceuticals in January 2006 and is located at 1090 Horsham Road, North Wales, Pennsylvania 19454.

j.      Ivax Corporation ("Ivax") was acquired by Teva Pharmaceutical Industries, Ltd. in January 2006 and is located at 4400 Biscayne Boulevard, Miami, Florida 33137.  Ivax operates as part of the Teva Active Pharmaceutical Ingredients ("TAPI") division, which is headquartered in Israel.

k.      Ivax Pharmaceuticals, Inc. was a wholly-owned subsidiary of Ivax and was located at 4400 Biscayne Boulevard, Miami, Florida 33137.

l.      Sicor, Inc. f/k/a Sicor Pharmaceuticals, Inc., f/k/a/ Gensia Sicor Pharmaceuticals, Inc. ("Sicor") was acquired by Teva Pharmaceutical Industries, Ltd. in January 2004 and is now a wholly-owned subsidiary of Teva Pharmaceutical Industries, Ltd. with its principal place of business located at 19 Hughes, Irving, California.

128.    Teva, individually and by and through their parents, predecessors, successors, subsidiaries, and affiliates, engage in the business of manufacturing, distributing, pricing, marketing, and selling prescription drugs purchased and/or reimbursed by Plaintiff and the Class.

129.    The drugs of Teva at issue in this action include drugs under Teva's labeler codes that have inflated AWPs.

130.    Upon information and belief, Teva manufactures, distributes, prices, markets, and sells pharmaceutical drugs under labeler codes 00093, 00172, 00332, 00480, 00555, 00575,

00703, 15894, 38245, 42185, 43806, 50732, 51285, 51846, 53183, 55953, 57844, 59310, 62528, 65473, and 68546, among others.  It is alleged that generic pharmaceutical drugs under such labeler codes were priced, marketed, and sold in the unlawful manner alleged herein, and therefore constitute "Subject Drugs".

131.    For example, the generic drug described above, divalproex sodium ER, which experienced a price increase of 736% in 6 months, has a labeler code of 00480 demonstrating that it was sold by Teva.  Another generic drug described above, pravastatin sodium, which experienced a price increase of over 400% in 6 months, has the labeler code of 00093 demonstrating that it was sold by Teva.

132.    The President and CEO of Teva, Erez Vigodman, received a letter from Congress in October 2014 concerning Congress' investigation into the "dramatic increase in generic drug prices", including the pricing of Teva's divalproex sodium and pravastatin sodium.  A true and correct copy of the letter to Mr. Vigodman is attached hereto as Exhibit "L".  Mr. Vigodman failed to respond to Congress' inquiry about Teva's conduct in relation to the pricing, marketing and sales of its generic drugs.

133.    Further, Mr. Vigodman was personally invited to appear before Congress to testify about his company's conduct.  He declined to appear.

### 16.    Watson Pharmaceuticals, Inc.

134.    Watson Pharmaceuticals, Inc. is a corporation with its corporate headquarters located at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054.

135.    Watson Pharmaceuticals, Inc. has a controlling interest in all of its successor entities, subsidiaries and affiliate entities, which have a role in the unlawful conduct alleged herein.  At all times material herein, all acts committed by or on behalf of Watson

Pharmaceuticals, Inc. were also committed by or on behalf of its successor entities, subsidiaries and affiliate entities. Watson Pharmaceuticals, Inc. controls the AWPs, WACs, and/or Direct Prices for their drugs, as well as the design, assembly, packaging, labeling, marketing, and advertising, even when manufactured, sold, and/or distributed by its successor entities, subsidiaries and affiliate entities. As such, Watson Pharmaceuticals, Inc. is also being sued for the conduct of its successor entities, subsidiaries and affiliate entities, including but not limited to the following, who are hereinafter collectively, along with Watson Pharmaceuticals, Inc., referred to as "Watson":

     a.     Watson Pharma Inc. f/k/a Schein Pharmaceuticals, Inc. ("Schein") is a wholly-owned subsidiary of Watson and was acquired by Watson in 2000.

     b.     Watson Laboratories, Inc. is a subsidiary of Watson.

     c.     Andrx Corporation, a/k/a Andrx Pharmaceuticals, Inc. ("Andrx") was acquired by Watson in 2006.

136.     The Watson defendants, individually and by and through their parents, predecessors, successors and affiliates, engage in the business of manufacturing, distributing, pricing, marketing and selling prescription drugs purchased and/or reimbursed by Plaintiff and the Class.

137.     In October 2012, Watson announced that it completed the acquisition of the Actavis Group. Because it is unclear what entities included in "Actavis" named herein were included in Watson's acquisition, Actavis is named separately herein.

138.     The drugs of Watson at issue in this action include drugs under Watson's labeler codes that have inflated AWPs.

139.     Upon information and belief, Watson manufactures, distributes, prices, markets, and sells pharmaceutical drugs under labeler codes 00364, 00536, 00591, 52544, 54391, 55515,

62002, 62037, and 71114, among others.  It is alleged that generic pharmaceutical drugs under such labeler codes were priced, marketed, and sold in the unlawful manner alleged herein and therefore constitute "Subject Drugs".

### 17.   West-Ward Pharmaceutical Corp.

140.   West-Ward Pharmaceutical Corp. ("West-Ward") is a corporation with its headquarters at 401 Industrial Way West, Eatontown, New Jersey 07724.

141.   West-Ward, individually and by and through their predecessors, successors, subsidiaries, and affiliates, engages in the business of manufacturing, distributing, pricing, marketing, and selling prescription drugs purchased and/or reimbursed by Plaintiff and the Class.

142.   The drugs of West-Ward at issue in this action include drugs under West-Ward labeler codes that have inflated AWPs.

143.   Upon information and belief, West-Ward manufactures, distributes, prices, markets, and sells pharmaceutical drugs under labeler codes 00143, 00641, and 23427, among others.  It is alleged that generic pharmaceutical drugs under such labeler codes were priced, marketed, and sold in the unlawful manner alleged herein, and therefore constitute "Subject Drugs".

144.   For example, the generic drug described above, doxycycline hyclate, which experienced a price increase of 828% in 6 months, has a labeler code of 00143 demonstrating that it was sold by West-Ward.  Another generic drug described above, digoxin, which experienced a price increase of 884%, has the same labeler code 00143 demonstrating that it was sold by West-Ward.  Finally, the drug glycopyrrolate, which experienced a price increase of 2,728% in 6 months, has the same labeler code 00143 demonstrating it was sold by West-Ward.

The President and CEO of West-Ward, Michael Raya, received a letter from Congress in October 2014 concerning Congress' investigation into the "dramatic increase in generic drug prices", including the pricing of West-Ward's doxycycline hyclate, digoxin, and glycopyrrolate.  A true and correct copy of the letter to Mr. Raya is attached hereto as Exhibit "M". Mr. Raya failed to respond to Congress' inquiry about West-Ward's conduct in relation to the pricing, marketing and sales of its generic drugs.

### 18.  Zydus Pharmaceuticals USA Inc.

145.   Zydus Pharmaceuticals USA Inc. ("Zydus") is a corporation with its headquarters at 73 Route 31 North, Pennington, New Jersey 08534.

146.   Zydus individually and by and through its predecessors, successors, subsidiaries, and affiliates, engages in the business of manufacturing, distributing, pricing, marketing and selling prescription drugs purchased and/or reimbursed by Plaintiff and the Class.

147.   The drugs of Zydus at issue in this action include drugs under Zydus labeler codes that have inflated AWPs.

148.   Upon information and belief, Zydus manufactures, distributes, prices, markets, and sells pharmaceutical drugs under labeler code 68382, among others.  It is alleged that generic pharmaceutical drugs under such labeler code were priced, marketed, and sold in the unlawful manner alleged herein, and therefore constitute "Subject Drugs".

149.   For example, the generic drug described above, divalproex sodium ER, which experienced a price increase of 736% in 6 months, has a labeler code of 68382 demonstrating that it was sold by Zydus.  Another generic drug described above, pravastatin sodium, which 573% in 6 months, has the same labeler code 68382 demonstrating that it was sold by Zydus.

150.     The CEO of Zydus, Joseph Renner received a letter from Congress in October 2014 concerning Congress' investigation into the "dramatic increase in generic drug prices", including the pricing of Zydus' divalproex sodium and pravastatin sodium.  A true and correct copy of the letter to Mr. Renner is attached hereto as Exhibit "N".  Mr. Renner failed to respond to Congress' inquiry about Zydus' conduct in relation to the pricing, marketing and sales of its generic drugs.

## III.    **JURISDICTION AND VENUE**

151.     This Court has jurisdiction to hear this matter pursuant to 42 Pa. C.S.A. §931 which grants this Court "unlimited original jurisdiction of all actions and proceedings."

152.     This Court has personal jurisdiction over defendants pursuant to 42 Pa. C.S.A. §5322 in that defendants, (a) are transacting business in this Commonwealth, as defined by 42 Pa. C.S.A. §5322(a)(1), (b) are causing harm to Pennsylvania citizens by acts occurring outside the Commonwealth, 42 Pa. C.S.A. §5322(a)(4), and/or (c) have maintained the most minimum contact with this Commonwealth allowed under the United States Constitution, 42 Pa. C.S.A. §5322(b).

153.     This Court has personal jurisdiction over each Defendant because either the Defendant resides in Pennsylvania, does business in Pennsylvania and/or has the requisite minimum contacts with Pennsylvania necessary to constitutionally permit the Court to exercise jurisdiction.

154.     Venue is appropriate in this Court because harmed Plaintiff reside in this county and have members who live in this county.  Pa. R. Civ. P. 1006(a).  Moreover, various instrumentalities of the conduct described herein have been located in Philadelphia, making this a county in which "a transaction or occurrence took place out of which the cause of action arose."

Further, defendant Lannett is located in Philadelphia and the Impax defendants distribute their generic drugs domestically and internationally from Philadelphia.

155.    Plaintiff brings this action exclusively under the common law and statutes of Pennsylvania, specifically the UTPCPL.  73 P.S. § 201-1, *et. seq.*  No federal claims are being asserted.  No aspect of the claims asserted herein is brought pursuant to any federal law, including either Medicare or ERISA, nor is any aspect of the claims asserted herein brought for the purpose of interpreting a federal contract, or the terms of an ERISA plan.  To the extent any claim or factual assertion set forth herein may be construed to have stated any claim under federal law, or a claim for recovery benefits under an ERISA plan, such claim is expressly and undeniably disavowed and disclaimed by the Plaintiff.

156.    This Court has jurisdiction over this matter by virtue of defendants' Notice of Removal filed February 10, 2016 (Dkt. No. 1).  Federal jurisdiction was claimed pursuant to 28 U.S.C. §§1332, 1441, 1446 and 1453.

## IV.    THE UNLAWFUL CONDUCT AT ISSUE

### A.    Reimbursement and Purchase of Prescription Drugs by the Plaintiff and the Class

157.    Local 690 and the Class purchase and reimburse prescription drugs using a formula which includes AWP as a key component of the amount of reimbursement.

158.    At all times during the relevant time period, Local 690 and the Class have obtained AWP values from the pricing compendia to which defendants reported their average wholesale prices.  The pricing compendia has included First Databank's Blue Book ("FDB") and Medical Economics' (Thomson Reuters) Red Book ("Red Book").

159.    Because AWP is embedded in the drug reimbursement formulas utilized by Local 690 and the Class, any increase in AWP values for any particular prescription drug results in a corollary increase in payment by Local 690 and the Class for such drug.

**B.      The Market for Prescription Drugs**

160.    The market for prescription drugs is enormously complex and non-transparent.  It is comprised of over 65,000 separate national drug codes ("NDCs").

161.    NDCs are eleven digit codes that uniquely identify drugs.  There is a separate NDC number for each dose and each quantity of each drug manufactured by each Defendant.

162.    The first four (4) or five (5) digits of the NDC of each drug are called the labeler code.  Each manufacturer and seller of prescription drugs in the United States has its own labeler.  By the labeler, one can determine the manufacturer of any drug.  Specific labeler codes for the defendants' Subject Drugs are identified above.

163.    Distribution and sale of prescription drugs to consumers is accomplished in several ways, depending on the provider and the type of drug.  Certain injectable or infused drugs are administered in-office by physicians, by home infusion pharmacies, and/or in hospital outpatient settings. Certain oral medications or pills are dispensed by retail and mail order pharmacies.  Each of these providers has billed the Plaintiff at the inflated AWPs for Subject Drugs as set by the defendants, and due to pricing and marketing practices of the defendants described herein.

**1.      Prescriber Dispensed Drugs ("PDDs")**

164.    Certain medications are dispensed and sold by medical professionals who prescribe them to patients such as the beneficiaries of Local 690 and the Class.  These drugs usually are either administered by injection, intravenously by infusion, or have such serious side

effects that must only be administered in a setting where a medical professional is available to supervise the patient.  For purposes of this Complaint, these prescription drugs shall be referred to as "Prescriber Dispensed Drugs" or "PDDs."

165.    In the case of PDDs, the prescriber purchases the drug either from a wholesaler or directly from the manufacturer, and then resells the drug to patients.  When the patient is covered by a government plan, or employer-based prescription drug plan, or other TPP plan, the prescriber will typically bill the plan based on the AWP for the drug, as set forth in the plan reimbursement methodology.

166.    Because of this billing arrangement, any difference between the actual average wholesale cost of such drugs and the AWP inures to the financial benefit of the prescriber, at the expense of the payor.  In other words, drug companies are able to drive substantial profits to their customers, and themselves, by driving up the end prices paid payors, like Local 690 and the Class.

## 2.    Pharmacy/Non-Prescriber Dispensed Drugs ("NPDDs")

167.    Most drugs that require a prescription are dispensed to consumers through pharmacies.  A health care professional authorized to write prescriptions typically writes a prescription for a consumer and the consumer takes that prescription to a pharmacy.  For purposes of this Complaint, these prescription drugs shall be referred to as "Non-Prescriber Dispensed Drugs" or "NPDDs".

168.    When a prescription is presented to a pharmacy for a NPDD, the consumer usually also informs the pharmacy whether the consumer will be paying by cash or whether the consumer has a government or private prescription plan.

169.     If the consumer has a government or private prescription plan, such as those administered by Local 690, those plans have been charged for the NPDDs obtained by the consumer beneficiary on a formula based on AWP, as set forth above.

170.     If the consumer has no insurance plan, and is a "cash payor," the consumer typically is charged at or above AWP by providers.

171.     Since at least 1991, the AWPs utilized by plans and paid by consumers and their third party payors have not reflected the actual average wholesale prices of prescriptions drugs, and the AWPs for the drugs at issue in this case have risen at a much faster rate that the actual average wholesale cost for the drugs. Significantly, the rate of increase since late 2013 for certain generic drugs has been staggering.

172.     The AWP-based system for drug reimbursement is a complicated, non-transparent system in which "average wholesale price" or "AWP" is the cornerstone of a larger pricing infrastructure.  Neither Local 690 nor its members or the Class had any way of knowing about the conduct of the generic drug companies alleged herein due to this complicated, non-transparent system.

**C.     The Origin and History of AWP**

173.     Throughout the relevant time period, the defendants were aware that a figure called the AWP was the embedded standard used by virtually all payors for drug products, including private insurance companies, federal and state aid programs, consumers, TPPs, and other payors, to determine how much to reimburse and pay for a given drug.

174.     Since the late 1960s, and throughout the relevant time period, nearly every prescription drug sold in the United States has had an AWP.  AWPs exist for virtually all drugs and classes of drugs, including defendants' drugs as set forth herein.

175.    Since the 1960s, prescription drugs have been paid for by government agencies, private employers and health plans, TPPs, and individual consumers on the basis of "Average Wholesale Price" ("AWP").  Originally, AWP was based on actual surveys of wholesale drug prices.

176.    However, AWP has become a price set by the defendants named herein at levels which have nothing to do with actual wholesale prices for their drugs.  By setting AWPs at prices other than actual average wholesale prices, the defendants in this case have done the following:

      a.    dramatically increased the prices paid for individual prescription drugs since 1991;

      b.    generated "spreads" between the actual average wholesale prices and the inflated AWPs, which spreads were used to distort the prescription drug market by highlighting financial remuneration available from high priced drugs as compared to more cost effective treatments;

      c.    increased utilization of prescription drugs paid for by the Plaintiff; and

      d.    increased their market shares for their prescription drugs.

177.    AWP was devised as a means of providing for reimbursement of prescription drugs distributed by retail pharmacies to beneficiaries of state and federal prescription programs at levels which provided recompense to pharmacies, but neither enriched, nor impoverished them.

178.    Reimbursement methodologies that depend on AWP depend on AWPs being accurate.  An AWP which reflects prices far greater than actual average wholesale prices improperly allows the enrichment of whoever in the chain of distribution receives, directly or indirectly, the difference between actual average wholesale prices and AWP.

179.    The defendants knew or should have known that government programs, and payors like Local 690 and the Class, which have historically used AWP, were not vehicles by which to enrich themselves or anyone else in the chain of distribution of prescription drugs.

They also knew or should have known that consumers and payors, like Plaintiff and the Class, should not be subjected to the sort of generic price gouging uncovered as part of the above-described Congressional investigation.

180.   Throughout the relevant time period, AWPs have been published in commercial pricing compendia, like Red Book, First Data Bank ("FDB") and Medispan.

181.   The defendants knew or should have known that when they did not report actual average wholesale prices to the pricing compendia, from whom virtually all end payors, including Local 690 and the Class, received AWPs, those inflated AWPs would increase and distort reimbursement levels for end payors and consumers.

182.   In periodically announcing the AWP for each drug, during the time period relevant to this Complaint, the pricing compendia publish the prices that are supplied to them by the defendants for their respective drugs.  For instance, the forward to the 1999 edition of the Red Book states that "all pricing information is supplied and verified by the products' manufacturers, and it should be noted that no independent review of those prices for accuracy is conducted."

183.   A system that bases its reimbursement rates for drugs on the published AWP is thus dependent on the honesty of drug manufacturers, including the defendants.  The defendants knew they could directly control and fabricate the AWP for their drugs at any time by forwarding to the publishers a false AWP.  The defendants also knew that actual transactional price data – the amounts charged to medical providers and others for their drugs – was not publically available, and they kept this information (on which AWPs should have been calculated) highly confidential and secret.

43

184.    The defendants knew or should have known that when they did not report actual average wholesale prices to the compendia, those inflated AWPs would increase and distort reimbursement levels.

185.    The defendants knew, or should have known, that with the widespread adoption of AWP as a component of reimbursement methodology, continued publication of an inflated AWP would harm TPPs and consumers.

186.    Despite knowing the harm an inflated AWP would cause, the defendants continued to transmit, or allow to be published, inaccurate information about AWPs.

187.    AWPs for individual drugs were reported at least annually, and sometimes with greater frequency.

188.    As detailed herein, the AWPs for the drugs at issue here bore little relationship to the drugs' pricing in the marketplace.  They were simply fabricated and overstated in furtherance of the defendants' scheme to generate a spread profit to providers, PBMs and others in the chain of drug distribution, and to increase the defendants' profits at the expense of Local 690 and the Class.

189.    The defendants' pattern of unfair and deceptive conduct in artificially inflating the AWPs for their generic drugs directly caused Local 690 and the Class to substantially overpay for those drugs.

190.    During the relevant time period, AWPs listed in the pricing compendia, and used by payors, including consumers and TPPs, to set reimbursement/payment rates for prescription drugs and charged by pharmacies to cash-paying consumers, were controlled and set by the defendants.

191.    In addition to controlling and setting the AWPs, defendants also controlled and set the actual acquisition costs of their drugs, *i.e.*, the prices paid by medical providers (including doctors and pharmacists), and other purchasers of their drugs who would ultimately seek reimbursement and payment for these drugs from payors, such as such as Local 690 and the Class.

192.    Defendants maintained exclusive control over data reflecting these actual acquisition costs, and such information has never been made publicly available by defendants to Local 690 and the Class.  In fact, defendants require purchasers to keep data reflecting their actual acquisition costs confidential, through contractual provisions and other means.

193.    Throughout the relevant time period, the defendants were the only ones with access to their pricing data and there was no method available for Plaintiff and the Class to determine how the defendants calculated the AWPs reported to the pricing compendia for each of their drugs.

194.    In fact, the AWPs reported by defendants were not actual average wholesale prices charged for their drugs.

195.    Rather, the reported AWPs were artificial prices, created and manipulated by defendants for the purpose of generating as much revenue as possible for themselves and their customers at the expense of end payors of their drugs, like Local 690 and the Class.

**D.    Unlawful Acts and Practices of the Defendants**

196.    Broadly speaking, there were at least five (5) types of acts and practices at the heart of the defendants' unfair and deceptive pricing, marketing and sales scheme:

a.    Inflating their reported AWPs far above the actual average wholesale prices for their drugs by, *inter alia*, failing to account in their reported AWPs for free goods, rebates, discounts, fees and other financial incentives that

reduced actual average wholesale prices for prescription drugs (hereinafter referred to as "AWP inflation");

b.  establishing and promoting "spreads" on prescription drugs (hereinafter referred to as "spread promotion");

c.  providing free goods and other drug products without charge, allowing customers to charge payors for such free goods and other free drug products (hereinafter referred to as "provision of free goods");

d.  providing other financial incentives, as detailed more fully herein, to induce sales of defendants' drugs at exorbitant prices (hereinafter referred to as "other financial incentives"); and

e.  engaging in efforts to conceal and suppress the above acts and practices from consumers and TPPs like Plaintiff and the Class to avoid detection and to maintain the scheme to sell prescription drugs at inflated prices (hereinafter referred to as "concealment").

These acts and practices are described more fully below, and represent one or more acts or practices which violate Pennsylvania law and laws of other states.

### E.    The Difference Between Brand and Generic Drugs

197.    Prescription drugs sold in the United States fall into two broad categories:  brand-name drugs and generic drugs.

198.    With some exceptions involving drugs that have been on the market for a very long time, like aspirin, all prescription drugs start as brand-name drugs approved by the FDA after the review of a New Drug Application.

199.    Concurrent with the filing of a New Drug Application, a brand-name drug manufacturer also files one or more patents covering the brand-name drug.

200.    As long as those patents are either in effect or not found invalid, a brand-name drug manufacturer is the only entity that can make that drug.

201.    When the patents on brand-name drugs expire, or when another manufacturer believes the patents were not valid in the first place, that manufacturer can file an application to sell a generic version of the brand-name drug.

202.    A manufacturer who wants to offer a generic drug must file an Abbreviated New Drug Application ("ANDA") which must certify that a generic version of a brand-name drug does not violate any valid patents and that the chemical formulation of the drug is the same as the brand and has the same effectiveness.

203.    Once a generic drug ANDA is approved by the FDA, the generic drug can be sold.

204.    The first generic drug approved for as a version of a brand-name drug receives a 180-day exclusivity period where only that manufacturer's version of the drug can be marketed.

205.    Once there are three or more versions of a generic drug on the market, actual wholesale prices typically drop substantially in comparison to one brand drug's wholesale price.

F.      **Inflation of AWPs.**

1.      **AWP inflation generally**

206.    During the relevant time period, defendants reported AWPs for each of their generic and brand name drugs to the pricing compendia, like First Databank ("FDB") and Red Book.

207.    The AWPs the pricing compendia reported to Plaintiff and the Class for defendants' drugs are the same prices that the defendants reported to the compendia.

208.    During the Class Period, the defendants deliberately and intentionally published AWPs for their drugs that did not reflect the actual pricing structure of the drugs.

209.    The defendants created and perpetuated this scheme so that the medical providers who purchased and dispensed these drugs at a low cost would bill patients and their insurers at

the inflated AWPs, and thereby earn a substantial profit from the "spread" between the real cost and the various AWP-related reimbursement rates.

210.    The defendants knew and understood that government programs, like Medicare, and private programs, like those administered by Local 690 and the Class, used Red Book, FDB and other publications to determine the AWPs of the drugs.  Because the defendants controlled the AWPs published in the compendia, the defendants knew and understood that they could manipulate the providers' profits from Plaintiff and the Class.

211.    The artificial inflation of the providers' profits created an illegal kickback to the providers, funded by Local 690 and the Class members' overpayments.

212.    The AWPs of the generic drugs of defendants named herein were set as a function of the AWP of the brand, generally a little more than 10% below the brand.  One reason for this was that 10% below the brand AWP of the generic's equivalent was the maximum AWP at which the generic price could be set and still obtain generic classification with the price reporting services.  If other generics were already on the market, the AWP typically was set to match the AWPs of the other competitors.  If a competitor raised its AWP, defendants typically would raise their AWP so as not to disadvantage their customers when they were paid by payors, like Plaintiff and the Class.  At times, in order to meet competitive bids, defendants would raise their AWP rather than lowering their contract prices.

213.    The defendants monitored the prices the pricing compendia reported for their own and their competitors' products.

214.    The pricing compendia periodically, but at least annually, sent lists of NDCs to the defendants for the defendants to verify the accuracy of the information the pricing compendia had on file for the company's drugs.  It is believed and therefore averred that the defendants all

complied with the formal processes in place at the pricing compendia for verifying manufacturers' prices.

215.   In the case of FDB, it provided defendants with a disk which listed a history of the wholesale acquisition costs ("WACs"), AWPs, and the company's other reported prices, as well as information on competitors' drug prices, so that the defendants could check to see if the information listed was correct.

216.   In the case of Red Book, it provided defendants with price lists and asked the companies to verify in writing that the prices were accurate.  Employees of Red Book also contacted responsible employees of the drug companies by telephone, letter, facsimile, and/or electronic mail to verify prices and AWP pricing policies.

217.   For instance, in about 2004, employees of Red Book contacted responsible employees of their drug company clients, including the defendants, to have them confirm their AWP pricing policies and the markup factor (if any) to be used in the event any company chose to not report AWPs for any products.  They also did so in succeeding years.  Red Book specifically apprised the companies that, in the absence of a manufacturer-reported AWP, Red Book would publish AWPs for brand name drug products at 25% above the reported WACs.

218.   The defendants also were contacted directly by the pricing compendia at other times during the years throughout the relevant time period to confirm that the prices received by the compendia were the prices the drug companies sent them, and the prices that should be published for the company's products.

### 2.      Actavis Defendants' AWP Inflation

219.   Actavis reported both WACs and AWPs to the pricing compendia at all times relevant to this litigation.

220.    When Actavis sent their WACs and AWPs to the price reporting services, they expected those services to publish them to third parties for purposes of reimbursement.

221.    The AWPs and WACs the pricing compendia published were the AWPs and WACs Actavis sent them.

222.    None of the prices reported by Actavis to the pricing compendia had any correlation to the prices Actavis actually charged their customers in the marketplace.  Rather, Actavis' AWPs were initially set at about 10.1% below the brand AWPs.

223.    Subsequent to initial launch, Actavis' AWPs would be raised to the same levels as those of competing manufacturers' AWPs.

224.    One of Actavis' purposes in increasing their AWPs was to increase the spread for their pharmacy customers.

225.    WACs were reduced as market prices dropped in order to minimize accruals for chargebacks and to reduce the cost of the prompt pay discounts.

226.    Actavis' AWP prices, WAC prices, and contract prices are independent of each other, with the AWPs far exceeding the actual contract price charged by Actavis to their customers.

227.    Actavis was aware that payors, including Plaintiff and the Class, used Actavis' reported AWP values for reimbursement.

228.    When Actavis raised their contract prices, they also raised the AWPs to maintain the spread so that their pharmacy customers would not be adversely affected by the market price increase.

229.    At all times material hereto, Actavis affirmatively concealed their true prices from third party payors and consumers, such as Plaintiff and the Class.  Customer contracts included

50

confidentiality provisions within their terms and conditions which precluded the customer from revealing to any third party the prices charged under the contracts.

230. At no time did Actavis disclose to Plaintiff and the Class any markup factors they utilized in setting the AWPs for their drugs. They have never disclosed to Plaintiff and the Class the truth about their inflated AWPs.

### 3. Apotex's AWP Inflation

231. Throughout the relevant time period, Apotex reported WACs and AWPs for their drugs to the pricing compendia. Apotex also reported to the compendia any changes to their existing AWP and WAC values.

232. The AWPs and WACs the pricing compendia published were the AWPs and WACs Apotex sent them.

233. Apotex reported AWPs for their drugs that had no correlation to the actual prices charged to customers in the marketplace.

234. Like their generic competitors, it is averred that Apotex followed the standard practice of setting their AWP for a newly launched generic drug at approximately 10% below the AWP of the branded bioequivalent version of the drug.

235. Upon launching a new generic drug, Apotex established both WACs and AWPs for the various NDCs of the new drug and reported these figures to the pricing compendia.

236. It is believed and therefore averred that, subsequent to initial launch, Apotex would adjust their AWPs to the same levels as those of competing manufacturers' AWPs.

237. Apotex was aware that the AWP and WAC prices they reported to the pricing compendia were used by third party payors and consumers, like Plaintiff and the Class, to

reimburse for Apotex drugs.  Apotex was also aware that third party payors and consumers paid based on AWP.

238.    Throughout the relevant time period, Apotex affirmatively concealed its true prices from Plaintiff and the Class.  It is believed and therefore averred that Apotex's customer contracts included confidentiality provisions which precluded the customer from revealing to any third party the prices charged under the contracts.

239.    At no time did Apotex disclose to Plaintiff and the Class any markup factors they utilized in setting the AWPs for their drugs.  They have never disclosed to Plaintiff and the Class the truth about their inflated AWPs.

### 4.    Dr. Reddy's AWP Inflation

240.    Throughout the relevant time period, Dr. Reddy's reported WACs and/or AWPs for their drugs to the pricing compendia.  Dr. Reddy's also reported to the compendia any changes to their existing AWP and/or WAC values.

241.    The AWPs and/or WACs the pricing compendia published were the AWPs and WACs Dr. Reddy's sent them.

242.    Dr. Reddy's reported AWPs for their drugs that had no correlation to the actual prices charged to customers in the marketplace.

243.    Like their generic competitors, it is averred that Dr. Reddy's followed the standard practice of setting their AWP for a newly launched generic drug at approximately 10% below the AWP of the branded bioequivalent version of the drug.

244.    Upon launching a new generic drug, Dr. Reddy's established both WACs and AWPs for the various NDCs of the new drug and reported these figures to the pricing compendia.

245.     It is believed and therefore averred that, subsequent to initial launch, Dr. Reddy's would adjust their AWPs to the same levels as those of competing manufacturers' AWPs.

246.     Dr. Reddy's was aware that the AWP and WAC prices reported by and to the pricing compendia were used by third party payors and consumers, like Plaintiff and the Class, to reimburse for Dr. Reddy's drugs.  Dr. Reddy's was also aware that Plaintiff and the Class paid based on AWP.

247.     Throughout the relevant time period, Dr. Reddy's affirmatively concealed its true prices from Plaintiff and the Class.  It is believed and therefore averred that Dr. Reddy's customer contracts included confidentiality provisions which precluded the customer from revealing to any third party the prices charged under the contracts.

248.     At no time did Dr. Reddy's disclose to Plaintiff and the Class any markup factors they utilized in setting the AWPs for their drugs.  They have never disclosed to Plaintiff and the Class the truth about their inflated AWPs.

### 5.     Endo's AWP Inflation

249.     Throughout the relevant time period, Endo reported WACs and/or AWPs for their drugs to the pricing compendia.  Endo also reported to the compendia any changes to their existing AWP and/or WAC values.

250.     The AWPs and/or WACs the pricing compendia published were the AWPs and/or WACs Endo sent them.

251.     Endo reported AWPs for their drugs that had no correlation to the actual prices charged to customers in the marketplace.

252.   Like their generic competitors, it is averred that Endo followed the standard practice of setting their AWP for a newly launched generic drug at approximately 10% below the AWP of the branded bioequivalent version of the drug.

253.   Upon launching a new generic drug, Endo established both WACs and AWPs for the various NDCs of the new drug and reported these figures to the pricing compendia.

254.   It is believed and therefore averred that, subsequent to initial launch, Endo would adjust their AWPs to the same levels as those of competing manufacturers' AWPs.

255.   Endo was aware that the AWP and WAC prices reported by and to the pricing compendia were used by third party payors and consumers, like Plaintiff and the Class, to reimburse for Endo drugs.  Endo was also aware that Plaintiff and the Class paid based on AWP.

256.   Throughout the relevant time period, Endo affirmatively concealed its true prices from Plaintiff and the Class.  It is believed and therefore averred that Endo's customer contracts included confidentiality provisions which precluded the customer from revealing to any third party the prices charged under the contracts.

257.   At no time did Endo disclose to Plaintiff and the Class any markup factors they utilized in setting the AWPs for their drugs.  They have never disclosed to Plaintiff and the Class the truth about their inflated AWPs.

### 6.   Forest's AWP Inflation

258.   Throughout the relevant time period, Forest reported WACs and/or AWPs for their drugs to the pricing compendia.  Forest also reported to the compendia any changes to their existing AWP and/or WAC values.

259.   The AWPs and/or WACs the pricing compendia published were the AWPs and WACs Forest sent them.

260.    Forest reported AWPs for their drugs that had no correlation to the actual prices charged to customers in the marketplace.

261.    Like their generic competitors, it is averred that Forest followed the standard practice of setting their AWP for a newly launched generic drug at approximately 10% below the AWP of the branded bioequivalent version of the drug.

262.    Upon launching a new generic drug, Forest established both WACs and AWPs for the various NDCs of the new drug and reported these figures to the pricing compendia.

263.    It is believed and therefore averred that, subsequent to initial launch, Forest would adjust their AWPs to the same levels as those of competing manufacturers' AWPs.

264.    Forest was aware that the AWP and WAC prices reported by and to the pricing compendia were used by third party payors and consumers, like Plaintiff and the Class, to reimburse for Forest' drugs.  Forest also was aware Plaintiff and the Class paid based on AWP.

265.    Throughout the relevant time period, Forest affirmatively concealed their true prices from Plaintiff and the Class.  It is believed and therefore averred that Forest' customer contracts included confidentiality provisions which precluded the customer from revealing to any third party the prices charged under the contracts.

266.    At no time did Forest disclose to Plaintiff and the Class any markup factors they utilized in setting the AWPs for their drugs.  They have never disclosed to Plaintiff and the Class the truth about their inflated AWPs.

### 7.        Heritage's AWP Inflation

267.    Throughout the relevant time period, Heritage reported WACs and/or AWPs for their drugs to the pricing compendia.  Heritage also reported to the compendia any changes to their existing AWP and/or WAC values.

268.    The AWPs and/or WACs the pricing compendia published were the AWPs and WACs Heritage sent them.

269.    Heritage reported AWPs for their drugs that had no correlation to the actual prices charged to customers in the marketplace.

270.    Like their generic competitors, it is averred that Heritage followed the standard practice of setting their AWP for a newly launched generic drug at approximately 10% below the AWP of the branded bioequivalent version of the drug.

271.    Upon launching a new generic drug, Heritage established both WACs and AWPs for the various NDCs of the new drug and reported these figures to the pricing compendia.

272.    It is believed and therefore averred that, subsequent to initial launch, Heritage would adjust their AWPs to the same levels as those of competing manufacturers' AWPs.

273.    Heritage was aware that the AWP and WAC prices reported by and to the pricing compendia were used by third party payors and consumers, like Plaintiff and the Class, to reimburse for Heritage drugs.

274.    Throughout the relevant time period, Heritage affirmatively concealed its true prices from Plaintiff and the Class.  It is believed and therefore averred that Heritage's customer contracts included confidentiality provisions which precluded the customer from revealing to any third party the prices charged under the contracts.

275.    At no time did Heritage disclose to Plaintiff and the Class any markup factors they utilized in setting the AWPs for their drugs.  They have never disclosed the truth to Plaintiff and the Class about their inflated AWPs.

### 8.     Impax's AWP Inflation

276.    Throughout the relevant time period, Impax reported WACs and/or AWPs for their drugs to the pricing compendia.  Impax also reported to the compendia any changes to their existing AWP and/or WAC values.

277.    The AWPs and/or WACs the pricing compendia published were the AWPs and WACs Impax sent them.

278.    Impax reported AWPs for their drugs that had no correlation to the actual prices charged to customers in the marketplace.

279.    Like their generic competitors, it is averred that Impax followed the standard practice of setting their AWP for a newly launched generic drug at approximately 10% below the AWP of the branded bioequivalent version of the drug.

280.    Upon launching a new generic drug, Impax established both WACs and AWPs for the various NDCs of the new drug and reported these figures to the pricing compendia.

281.    It is believed and therefore averred that, subsequent to initial launch, Impax would adjust their AWPs to the same levels as those of competing manufacturers' AWPs.

282.    Impax was aware that the AWP and WAC prices reported by and to the pricing compendia were used by third party payors and consumers, like Plaintiff and the Class, to reimburse for Impax drugs.

283.    Throughout the relevant time period, Impax affirmatively concealed its true prices from Plaintiff and the Class.  It is believed and therefore averred that Impax's customer contracts included confidentiality provisions which precluded the customer from revealing to any third party the prices charged under the contracts.

284.    At no time did Impax disclose to Plaintiff and the Class any markup factors they utilized in setting the AWPs for their drugs.  They have never disclosed to Plaintiff and the Class the truth about their inflated AWPs.

### 9.    K-V's AWP Inflation

285.    Throughout the relevant time period, K-V reported WACs and/or AWPs for each of their drugs to the pricing compendia.  K-V also reported to the compendia any changes to their existing AWP and/or WAC values.

286.    The AWPs and/or WACs the pricing compendia published were the AWPs and/or WACs K-V sent them.

287.    K-V reported AWPs for their drugs that had no correlation to the actual prices charged to customers in the marketplace.

288.    It is averred that K-V followed the standard practice of setting their AWP for a newly launched generic drug at approximately 10% below the AWP of the branded bioequivalent version of the drug.

289.    Upon launching a new generic drug, K-V established both WACs and AWPs for the various NDCs of the new drug and reported these figures to the pricing compendia.

290.    It is believed and therefore averred that, subsequent to initial launch, K-V would adjust their AWPs to the same levels as those of competing manufacturers' AWPs.

291.    K-V was aware that the AWP and WAC prices reported by and to the pricing compendia were used by third party payors and consumers, like Plaintiff and the Class, to reimburse for the K-V defendants' drugs.

292.    Throughout the relevant time period, K-V affirmatively concealed their true prices from Plaintiff and the Class.  It is believed and therefore averred that K-V customer

contracts included confidentiality provisions which precluded the customer from revealing to any third party the prices charged under the contracts.

293.    At no time did K-V disclose Plaintiff and the Class any markup factors they utilized in setting the AWPs for their drugs.  They have never disclosed to Plaintiff and the Class the truth about their inflated AWPs.

## 10.    Lannett's AWP Inflation

294.    Throughout the relevant time period, Lannett reported WACs and/or AWPs for their drugs to the pricing compendia.  Lannett also reported to the compendia any changes to their existing AWP and/or WAC values.

295.    The AWPs and/or WACs the pricing compendia published were the AWPs and WACs Lannett sent them.

296.    Lannett reported AWPs for their drugs that had no correlation to the actual prices charged to customers in the marketplace.

297.    Like their generic competitors, it is averred that Lannett followed the standard practice of setting their AWP for a newly launched generic drug at approximately 10% below the AWP of the branded bioequivalent version of the drug.

298.    Upon launching a new generic drug, Lannett established both WACs and AWPs for the various NDCs of the new drug and reported these figures to the pricing compendia.

299.    It is believed and therefore averred that, subsequent to initial launch, Lannett would adjust their AWPs to the same levels as those of competing manufacturers' AWPs.

300.    Lannett was aware that the AWP and WAC prices they reported to the pricing compendia were used by third party payors and consumers, like Plaintiff and the Class, to reimburse for Lannett drugs.

301.    Throughout the relevant time period, Lannett affirmatively concealed its true prices from third party payors, such as Plaintiff and the Class.  It is believed and therefore averred that Lannett's customer contracts included confidentiality provisions which precluded the customer from revealing to any third party the prices charged under the contracts.

302.    At no time did Lannett disclose to Plaintiff and the Class any markup factors they utilized in setting the AWPs for their drugs.  They have never disclosed to Plaintiff and the Class the truth about their inflated AWPs.

**11.    Mylan Defendants' AWP Inflation**

303.    At all relevant times, the Mylan defendants reported both WAC and AWP values to the pricing compendia.  However, none of the prices reported by the Mylan defendants to the compendia had any correlation to the prices the Mylan defendants actually charged their customers in the marketplace.

304.    When the Mylan defendants sent AWPs to the price reporting services, they expected those services to publish them to third parties for purposes of reimbursement.  The Mylan defendants reported AWPs because it was necessary to report them to the national databases to have their products recognized and reimbursed by third parties, like Plaintiff and the Class.

305.    As with their generic competitors, it is averred that the Mylan defendants understood that a drug's AWP needed to be a minimum of 10% to 11% below the AWP of the bioequivalent branded drug to be treated as a generic.  Like their competitors, the Mylan defendants set the AWPs for their drugs at 10-11% below the brand AWP, and not any greater, even though they were free to set the AWP at any level below AWP minus 10% to maintain the drug's status as a generic.

60

306.    The Mylan defendants' AWP prices, WAC prices and contract prices are independent of each other, with the AWPs far exceeding the actual contract prices charged by the Mylan defendants to their customers.

307.    The Mylan defendants did not sell their products to their customers at AWP.

308.    The Mylan defendants' WAC is the invoice price to the wholesale customer. However, there are certain conditional discounts and rebates that a wholesaler can earn that can reduce the dollar amount it actually pays for the Mylan defendants' products.

309.    Although wholesale transactions are generally priced at WAC, the Mylan defendants' individual negotiations with retail pharmacies may procure an agreement to sell the Mylan defendants' products to those customers at less than WAC.

310.    The Mylan defendants were aware that the Mylan defendants' reported AWP prices were used for reimbursement by third party payors and consumers, like Plaintiff and the Class, to reimburse for Mylan drugs.

311.    The Mylan defendants' control over the WACs and inflated AWPs can perhaps best be shown by the example of their drug lorazepam.

312.    In about October 1987, the Mylan defendants began selling lorazepam, a generic drug generally used to treat anxiety, tension, agitation, and insomnia, and at times used as a preoperative sedative.  The brand name version of lorazepam is called Ativan®.  Ativan® was manufactured and sold in tablet form by Wyeth Pharmaceuticals during the relevant time period, and is now manufactured and sold by Biovail Pharmaceuticals, Inc.

313.    In about March 1998, the Mylan defendants substantially raised the WACs and AWPs for lorazepam, as shown below:

| PRODUCT | NDC | New AWP | Old WAC | New WAC |
|---------|-----|---------|---------|---------|
| lorazepam | 00378-0321-01 | $64.31 | $1.50 | $30.60 |
| lorazepam | 00378-0321-05 | $312.59 | $6.85 | $145.05 |
| lorazepam | 00378-0457-01 | $83.77 | $1.80 | $40.20 |
| lorazepam | 00378-0457-05 | $405.24 | $7.30 | $191.50 |
| lorazepam | 00378-0457-10 | $796.67 | $13.60 | $378.40 |

314.    The Mylan defendants again raised the prices for lorazepam last year, by up to 10% for the 20 mg vial and more than 40% for the 2 mg tablet, in conjunction with other extraordinary generic drug price moves being investigated by Congress.

315.    At all times material hereto, the Mylan defendants affirmatively concealed their true prices from the Plaintiff and the Class.  The Mylan defendants' customer contracts included confidentiality provisions within their terms and conditions which prevented the customer from revealing to any third party information about the prices actually charged in the contracts.

316.    At no time did the Mylan defendant disclose to the Plaintiff and the Class any markup factors they utilized in setting AWPs for their drugs.  They have never disclosed to the Plaintiff or members of the Class the truth about their inflated AWPs.

### 12.    Par's AWP Inflation

317.    Throughout the relevant time period, Par reported the AWP for each of their drugs to the pricing compendia.  Par also reported to FDB any changes to their existing AWP prices.

318.    Par reported AWPs for their drugs had no correlation to the actual prices charged to customers in the marketplace.  Rather, to insure that their drug was identified as a generic in the pricing compendia, like their generic competitors, it is averred that Par set their AWP for a newly launched drug approximately 10% below the AWP of the branded bioequivalent version of the drug.

319.    Par knew that they had to report their AWPs to the pricing services in order to get their drug information loaded into the compendia's reporting system so that pharmacists and

other providers could get reimbursed by third party payors, like Medicaid and PACE.  Par understood that Plaintiff and the Class were third party payors that would reimburse pharmacies at AWP.

320.    Upon launching a new generic drug, Par established an AWP for the drug and reported this figure to the pricing compendia.  Par also established a WAC for the drug.

321.    Once a drug was established in the marketplace, Par would adjust the drug's AWP based upon a review of competitors' AWP listing for competing drugs as published with the pricing services.  Par understood that this was a standard practice for generic drugs.

322.    Par would provide the AWP to customers in an offer letter when launching a new drug or seeking to add new accounts.  In addition, Par received standing requests from various entities to be notified directly when Par changed their AWP prices.  In certain circumstances, Par would proactively notify their customer base of any upcoming change in AWP prices.

323.    Examples of AWPs Par reported to FDB, and the changes thereto over time, include the following:

| DRUG NAME | NDCS | EFFECTIVE DATE | AWP | AWP PER UNIT |
|-----------|------|----------------|-----|--------------|
| Ibuprofen 600 mg. | 49884046805 | 7/1/96 | $76.38 | 0.15076 |
|  |  | 5/1/98 | $86.00 | 0.17200 |
|  |  | 10/13/98 | $114.43 | 0.22886 |
|  |  | 2/1/00 | $120.15 | 0.24030 |
| Ibuprofen 800 mg. | 49884046905 | 7/1/96 | $107.50 | 0.21500 |
|  |  | 5/1/98 | $125.50 | 0.25100 |
|  |  | 10/13/98 | $145.12 | 0.29024 |
|  |  | 2/1/00 | $152.38 | 0.30476 |
| Ranitidine 150 mg. | 49884054401 | 1/28/99 | $148.80 | 1.4880 |
|  |  | 5/15/00 | $156.20 | 1.5620 |
| Ranitidine 150 mg. | 49884054402 | 1/28/99 | $89.10 | 1.48200 |
|  |  | 5/15/00 | $95.30 | 1.58833 |
| Ranitidine 150 mg. | 49884054405 | 1/28/99 | $751.00 | 1.5020 |
|  |  | 5/15/00 | $780.00 | 1.5600 |
| Ranitidine 150 mg. | 49884054410 | 1/28/99 | $1480.00 | 1.48000 |
|  |  | 5/15/00 | $1528.00 | 1.52800 |

| Ranitidine 150 mg. | 49884064702 | 12/1/00 | $91.27 | 1.5620 |

324.     Par's WAC price was, and is, an undiscounted list price at which the Par

defendants invoiced certain wholesalers.  Par typically established their WAC price at a discount

from the WAC price for the equivalent brand pharmaceutical.

325.     Although Par initially set the WAC price at a discount of approximately 20% to

the bioequivalent branded drug's WAC, competition in the generic drug market quickly drove

the WAC price down.

326.     Par understood that if they chose to supply their WAC prices to the pricing

compendia, competing manufacturers could then use the published WACs in an effort to

determine Par's contract pricing.

327.     It is believed and therefore averred that, as a matter of policy, Par did not supply

their WAC prices or any pricing terms – other than AWP values – to the pricing compendia.

328.     Nevertheless, FDB, from time to time, relied on alternative sources to obtain what

purported to be WAC prices for Par's products.

329.     Although Par did not directly report any other prices to the pricing compendia,

Par knew that the pricing services, like FDB, were collecting and reporting WAC prices for Par's

listed drugs under the heading "WHLNET."

330.     Par claimed they did not publicly report their WAC prices because it might allow

their competitors to determine their actual contract prices with their customers, thereby providing

their competitors with an unfair pricing advantage in the generic drug marketplace.

331.     Par's WAC price for any particular drug was not the price actually charged to the

majority of their customers.  Although Par's employees considered the WAC price to represent

the billing or invoice price, the actual amount owing from a wholesale customer often would be reduced to reflect rebates, discounts and chargebacks credited to the particular customer.

332.    Par had a significant customer base that had contract prices that were lower than WAC.

333.    Throughout the relevant time period, Par affirmatively concealed their true prices from Plaintiff and the Class.  Par's customer contracts included confidentiality provisions which precluded the customer from revealing to any third party the prices charged under the contracts.

334.    At no time did Par disclose to Plaintiff and the Class any markup factors they utilized in setting the AWPs for their drugs.  They have never disclosed to Plaintiff and the Class the truth about their inflated AWPs.

### 13.    Ranbaxy's AWP Inflation

335.    Throughout the relevant time period, Ranbaxy reported WACs and/or AWPs for their drugs to the pricing compendia.  Ranbaxy also reported to the compendia any changes to their existing AWP and/or WAC values.

336.    The AWPs and/or WACs the pricing compendia published were the AWPs and WACs Ranbaxy sent them.

337.    Ranbaxy reported AWPs for their drugs that had no correlation to the actual prices charged to customers in the marketplace.

338.    Like their generic competitors, it is averred that Ranbaxy followed the standard practice of setting their AWP for a newly launched generic drug at approximately 10% below the AWP of the branded bioequivalent version of the drug.

339.    Upon launching a new generic drug, Ranbaxy established both WACs and AWPs for the various NDCs of the new drug and reported these figures to the pricing compendia.

340.    It is believed and therefore averred that, subsequent to initial launch, Ranbaxy would adjust their AWPs to the same levels as those of competing manufacturers' AWPs.

341.    Ranbaxy was aware that the AWP and WAC prices reported by and to the pricing compendia were used by third party payors and consumers, like Plaintiff and the Class, to reimburse for Ranbaxy drugs.

342.    Throughout the relevant time period, Ranbaxy affirmatively concealed its true prices from Plaintiff and the Class.  It is believed and therefore averred that Ranbaxy's customer contracts included confidentiality provisions which precluded the customer from revealing to any third party the prices charged under the contracts.

343.    At no time did Ranbaxy disclose to Plaintiff and the Class any markup factors they utilized in setting the AWPs for their drugs.  They have never disclosed to the Plaintiff and the Class the truth about their inflated AWPs.

### 14.    Sandoz's AWP Inflation

344.    Sandoz reported both WACs and AWPs to the pricing compendia at all times relevant to this litigation.

345.    When Sandoz sent their WACs and AWPs to the price reporting services, they expected those services to publish them to third parties for purposes of reimbursement.

346.    The AWPs and WACs the pricing compendia published were the AWPs and WACs Sandoz sent them.

347.    Sandoz sets the AWP for each of its drugs, and since at least 1993, has reported the AWPs it sets for each of its drugs to the pricing compendia.

348.    None of the prices reported by Sandoz to the pricing compendia had any correlation to the prices Sandoz actually charged their customers in the marketplace.

349.    For instance, on or about January 2003, Sandoz reported and caused to be published an AWP for the drug Atenolol of $792.49 even though the price to retail chain drug stores was $33.08.  The spread between the true price and the AWP reported by Sandoz was approximately 2296%. The spread between the highest price charged to Sandoz' customers and Sandoz' reported AWPs is hundreds, if not thousands, of percent.

350.    Sandoz knows the AWPs for its drugs that the pricing compendia publishes because Sandoz purchases a product called Analy$ource that contains the pricing compendia's published AWPs for Sandoz' drugs.  Sandoz reports AWPs to FDB because its customers (including retail pharmacies that are reimbursed by state Medicaid programs) expect it, because AWPs affect the reimbursement to those customers, and because it is necessary in order to sell Sandoz' drugs.

351.    In the instances where the pricing compendia did not publish the identical AWP Sandoz reported to it for a Sandoz drug, Sandoz advised the pricing compendia of this fact and the compendia then published the corrected AWP as requested by Sandoz.  Sandoz has never taken any action to stop, object to, or otherwise oppose the publication of the AWP for any of its drugs by the pricing compendia.

352.    Subsequent to initial launch, Sandoz's AWPs would be raised to the same levels as those of competing manufacturers' AWPs.

353.    One of Sandoz's purposes in increasing their AWPs was to increase the spread for their pharmacy customers.

354.    WACs were reduced as market prices dropped in order to minimize accruals for chargebacks and to reduce the cost of the prompt pay discounts.

355.     Sandoz's AWP prices, WAC prices, and contract prices are independent of each other, with the AWPs far exceeding the actual contract price charged by Sandoz to their customers.

356.     Sandoz was aware that state Medicaid agencies (including DPW) and Pennsylvania's Aging, used Sandoz's reported AWP values for reimbursement.

357.     When the Sandoz defendants raised their contract prices, they also raised the AWPs to maintain the spread so that their pharmacy customers would not be adversely affected by the market price increase.

358.     At all times material hereto, Sandoz affirmatively concealed their true prices from third party payors, such as Plaintiff and the Class.  Customer contracts included confidentiality provisions within their terms and conditions which precluded the customer from revealing to any third party the prices charged under the contracts.

359.     At no time did Sandoz disclose to Plaintiff and the Class any markup factors they utilized in setting the AWPs for their drugs.  They have never disclosed to Plaintiff and the Class the truth about their inflated AWPs.

### 15.     Sun's AWP Inflation

360.     Throughout the relevant time period, Sun reported WACs and/or AWPs for their drugs to the pricing compendia.  Sun reported to the compendia any changes to their existing AWP and/or WAC values.

361.     The AWPs and/or WACs the pricing compendia published were the AWPs and WACs Sun sent them.

362.     Sun reported AWPs for their drugs that had no correlation to the actual prices charged to customers in the marketplace.

363.    Like their generic competitors, it is averred that Sun followed the standard practice of setting their AWP for a newly launched generic drug at approximately 10% below the AWP of the branded bioequivalent version of the drug.

364.    Upon launching a new generic drug, Sun established both WACs and AWPs for the various NDCs of the new drug and reported these figures to the pricing compendia.

365.    It is believed and therefore averred that, subsequent to initial launch, Sun would adjust their AWPs to the same levels as those of competing manufacturers' AWPs.

366.    Sun was aware that the AWP and WAC prices they reported to the pricing compendia were used by third party payors and consumers, like Plaintiff and the Class, to reimburse for Sun's drugs.

367.    Throughout the relevant time period, Sun affirmatively concealed its true prices from third party payors, such as Plaintiff and the Class, and from consumers.  It is believed and therefore averred that Sun's customer contracts included confidentiality provisions which precluded the customer from revealing to any third party the prices charged under the contracts.

368.    At no time did Sun disclose to Plaintiff and the Class any markup factors they utilized in setting the AWPs for their drugs.  They have never disclosed to Plaintiff and the Class the truth about their inflated AWPs.

### 16.    Teva's AWP Inflation

369.    It is believed and therefore averred that Teva reported both WACs and AWPs to the pricing compendia, like FDB and Red Book, at all times relevant to this litigation.

370.    None of the prices reported by Teva to the pricing compendia had any correlation to the prices they charged their customers in the marketplace.

371.    Like other generic companies, Teva set their AWPs at 10% below the brand AWP.

372.    Teva's WACs were set at 25% of their AWP values.  Teva's WAC prices were lowered if contract prices were a lot lower than the WACs in order to reduce prompt pay discounts and other accrual-based discounts that Teva provided to customers.

373.    In or about 2002, Teva began adding a disclaimer to their price reports to the effect that the AWP does not represent the price actually paid by pharmacies.  No such disclaimer was applied to the reported WAC prices.

374.    In general, Teva expected that their contract prices would go down over time, their WACs may be reduced over time, and that generally their AWPs would remain the same over time.

375.    Teva was aware that their reported WAC and AWP prices were used for reimbursement by third party payors, including Plaintiff and the Class.

376.    Pricing information was sent immediately to the pricing compendia upon launch of a product because the pharmacists needed that information to be paid by the third parties.

377.    Throughout the relevant time period, Teva considered their actual prices to be highly confidential and affirmatively concealed their true prices from third party payors, such as Plaintiff and the Class, and from consumers.

378.    At no time did Teva disclose to Plaintiff and the Class any markup factors they utilized in setting the AWPs for their drugs.  They have never disclosed to Plaintiff and the Class the truth about their inflated AWPs.

### 17.    Watson's AWP Inflation

379.    Watson currently report WACs and something called a "Suggested Wholesale Price" ("SWP") to the pricing compendia.  In the past, including throughout the 1990s, Watson reported AWPs to the pricing services.  However, in about 2000, Watson began reporting SWP instead of AWP.

380.    Watson communicated prices to the pricing compendia by means of reports called "Infolerts".

381.    The WACs, AWPs and SWPs Watson reported to the pricing compendia are the same WACs, AWPs and SWPs the compendia transmitted to Plaintiff and the Class for use in reimbursement.

382.    Prior to the August 2000 acquisition of Schein by Watson, Schein also generally reported WAC, AWP and Direct Price ("DP") to the pricing compendia.

383.    None of the prices reported by Watson or Schein to the pricing compendia had any correlation to the prices they actually charged their customers in the marketplace.

384.    Watson had a formal protocol in place for disseminating their products and reported price changes to the pricing compendia.  Watson's protocol was as follows:

> A mailing list consisting of the pricing database companies and several claims processors was maintained.

> Price and product changes were mailed once a month prior to the effective date.

> Subscriptions to the pricing database monthly reference journals were retained to monitor the price updating process.

385.    Neither Watson nor Schein reported their contract prices to the pricing compendia.  Instead, the AWPs and WACs were set as follows:

> For a new generic product with no generic competition, the AWP was set approximately 10 to 11 percent below the brand AWP.  The WAC was set approximately 20 to 25 percent below the generic AWP.
>
> If there were already generic competitors in the market when a new generic was launched, the AWP would be set at the same level as that of the market leader by market share.  The WAC was set at the same level as the competitors' WACs.

386.    Watson subscribed to pricing database monthly journals to monitor the price updating process.  Watson regularly monitored what FDB and the other price reporting services were reporting with regard to their drugs to ensure that the reports were consistent with their records.

387.    FDB periodically sent Watson a report to verify the information that they had reported to FDB with regard to Watson's drugs, known as the "Blue Book Update Report".

388.    In addition to descriptions of Watson's drugs, the FDB Blue Book Update Report listed prices under the headings WHLNET, DIR and AWP.  The "WHLNET" meant "wholesale net" and referred to the WAC.

389.    Watson was aware that the AWP and WAC prices they reported to the pricing compendia were used by third party payors and consumers, like Plaintiff and the Class, to reimburse for Watson's drugs.

390.    Throughout the relevant time period, Watson affirmatively concealed their true prices from Plaintiff and the Class.  Customer contracts included confidentiality provisions within their terms and conditions which precluded the customer from revealing to any third party information including the prices charged in the contracts.

391.    At no time did Watson disclose to Plaintiff and the Class any markup factors they utilized in setting AWPs for their drugs.  They have never disclosed to Plaintiff and the Class the truth about their inflated AWPs.

### 18.    West-Ward's AWP Inflation

392.    Throughout the relevant time period, West-Ward reported WACs and/or AWPs for their drugs to the pricing compendia.  West-Ward also reported to the compendia any changes to their existing AWP and/or WAC values.

393.    The AWPs and/or WACs the pricing compendia published were the AWPs and/or WACs West-Ward sent them.

394.    West-Ward reported AWPs for their drugs that had no correlation to the actual prices charged to customers in the marketplace.

395.    Like their generic competitors, it is averred that West-Ward followed the standard practice of setting their AWP for a newly launched generic drug at approximately 10% below the AWP of the branded bioequivalent version of the drug.

396.    Upon launching a new generic drug, West-Ward established both WACs and AWPs for the various NDCs of the new drug and reported these figures to the pricing compendia.

397.    It is believed and therefore averred that, subsequent to initial launch, West-Ward would adjust their AWPs to the same levels as those of competing manufacturers' AWPs.

398.    West-Ward was aware that the AWP and WAC prices they reported to the pricing compendia were used by third party payors and consumers, like Plaintiff and the Class, to reimburse for West-Ward drugs.

399.    Throughout the relevant time period, West-Ward affirmatively concealed its true prices from Plaintiff and the Class.  It is believed and therefore averred that West-Ward customer contracts included confidentiality provisions which precluded the customer from revealing to any third party the prices charged under the contracts.

400.    At no time did West-Ward disclose to Plaintiff and the Class any markup factors they utilized in setting the AWPs for their drugs.  They have never disclosed to Plaintiff and the Class the truth about their inflated AWPs.

### 19.    Zydus' AWP Inflation

401.    Throughout the relevant time period, Zydus reported WACs and/or AWPs for their drugs to the pricing compendia.  Zydus also reported to the compendia any changes to their existing AWP and/or WAC values.

402.    The AWPs and/or WACs the pricing compendia published were the AWPs and WACs Zydus sent them.

403.    Zydus reported AWPs for their drugs that had no correlation to the actual prices charged to customers in the marketplace.

404.    Like their generic competitors, it is averred that Zydus followed the standard practice of setting their AWP for a newly launched generic drug at approximately 10% below the AWP of the branded bioequivalent version of the drug.

405.    Upon launching a new generic drug, Zydus established both WACs and AWPs for the various NDCs of the new drug and reported these figures to the pricing compendia.

406.    It is believed and therefore averred that, subsequent to initial launch, Zydus would adjust their AWPs to the same levels as those of competing manufacturers' AWPs.

407.    Zydus was aware that the AWP and WAC prices they reported to the pricing compendia were used by third party payors and consumers, like Plaintiff and the Class, to reimburse for Zydus drugs.

408.    Throughout the relevant time period, Zydus affirmatively concealed its true prices from Plaintiff and the Class.  It is believed and therefore averred that Zydus' customer contracts included confidentiality provisions which precluded the customer from revealing to any third party the prices charged under the contracts.

409.    At no time did Zydus disclose to Plaintiff and the Class any markup factors they utilized in setting the AWPs for their drugs.  They have never disclosed to Plaintiff and the Class the truth about their inflated AWPs.

## G.    Creation and Promotion of Spreads

410.    By creating large differences or "spreads" between what physicians, pharmacists, and other direct purchasers paid for prescription drugs, and what those purchasers were able to charge Plaintiff and the Class for such drugs, the defendants have been able to provide strong incentives for their customers to purchase their drugs over competitor's drugs based upon the increased income that they could earn from the spreads.

411.    One way that defendants have created increased spreads is by giving wholesale purchasers discounts off of the WAC.  For example, defendants have given discounts for prompt payment and stocking allowances.  These discounts have decreased the amount that wholesale purchasers actually pay defendants, effectively reducing the true WAC below the WAC that defendants reported.  By effectively reducing the WAC through these discounts, the spread between the true WAC and the inflated AWP increased, and the wholesale purchasers, like retail pharmacies, have enjoyed a larger profit.

412.    The financial incentives created by the spreads also has induced providers (like doctors and pharmacists) to prescribe higher priced generic drugs over cheaper and equally effective, alternative medicines, as well as other forms of medical treatment, resulting in greater demand for the higher-priced drugs with the largest spreads.

413.    In order to gain market share by inducing customers to purchase, prescribe, or recommend one drug over another, the defendants overtly and aggressively promoted spreads to their customers, throughout the relevant time period, as a reason to purchase and/or prescribe their drugs over other options for healthcare treatment.

414.    All defendants have been aware of the importance of the spread for marketing purposes.  All defendants published their AWPs in compendia product catalogues so that providers could determine the spread based upon the reimbursement they could achieve from payors like Plaintiff and the Class.  All defendants monitored their reported prices, and those of their competitors, to ensure that their customers were not disadvantaged by noncompetitive spreads for their drugs.

415.    The defendants' actions have completely corrupted the market for prescription drugs.  Instead of competing on price and medicinal value alone, the defendants have deliberately sought to create a powerful financial incentive for providers to prescribe drugs based primarily on the spread between the true price of a drug and its published AWP or WAC.

**H.    Provision of Free Goods and Free Drug Products**

416.    Upon information and belief, the defendants have used offers for free goods and free drug products as a method of providing hidden price concessions or reductions in the acquisition costs for their drugs.  The provision of free drugs, *i.e.* at zero acquisition cost, allows

the defendants to provide money to providers for the purchase of their products when providers bill for such products.

417.    Defendants' offers of free goods and free drug products included not only free shipments of drugs and product, but also free product bundled with other products, such as "buy ten get one free" deals, arrangements to provide credit for past or future purchases, or to forgo payments for products already delivered.

418.    Defendants used the provision of free goods and free drug product as another form of improper incentive to cause providers to prescribe defendants' drugs and seek reimbursement at AWP from payors like Plaintiff and the Class.  These incentives caused their customers to purchase high-priced drugs .

419.    Certain drug companies provided free goods and other free products to their customers with the full knowledge and the expectation that these products would be billed to payors by providers who charged patients for them.  Such practices violated the Prescription Drug Marketing Act ("PDMA") and the 2003 Compliance Guidance for Prescription Drug Manufacturers.  By providing free samples for billing, these defendants sought to induce the providers and other recipients thereof to prescribe and sell defendants' drugs over competing drugs or alternative forms of medical care and treatment.

420.    The free goods and products were used to offset the total cost associated with the purchases of the defendants' drugs, thereby increasing the "spread."  Moreover, the defendants specifically told providers to bill Plaintiff and the Class for the free goods, which defendants knew was unlawful.

421.    Every free sample of a drug for which a provider bills a patient or insurer effectively reduces that provider's overall cost for that drug.  However, the full cost of the drug

was charged to Plaintiff and the Class, and the value of the free samples was not used by the defendants in calculating the AWP, which in turn inflates the AWP.

422.    Although the defendants provided free goods and products and marketed them as a way to lower providers' actual cost of the defendants' drugs, they did not include the value of the free goods and products in calculating the AWPs for those drugs.  Thus, the defendants effectively and improperly passed on the cost of the free goods and products directly to Plaintiff and the Class.

423.    Drug companies TAP and AstraZeneca were prosecuted criminally and pled guilty to conspiracy with doctors to bill payors for free goods of their high-priced cancer drugs, Lupron and Zoladex.  The Commonwealth of Pennsylvania sued both companies in the previously mentioned herein 2004 Brand Litigation and settled with them.

424.    Plaintiff and the Class were harmed by defendants' conduct in providing free goods and free product as an inducement by paying the inflated AWPs for defendants' drugs that were not reduced by the value of free goods and free drug products, and by potentially paying the costs of free goods and free drug products that were improperly billed.  Only discovery into defendants' practices will reveal the details of their unlawful conduct in this regard, which has been concealed from the public.

### I.    Other Financial Inducements

425.    Defendants provided other financial incentives to their customers to drive sales of their products at inflated AWPs.  These incentives have included, but were not limited to, the provision of trips, consulting opportunities, "educational grants", seminars, gifts, meals, cash payments, and debt forgiveness, among other things.

426.     Defendants also have provided and/or arranged for many other non-public financial inducements to drive sales of their drugs at the expense of Plaintiff and the Class.  Such inducements included volume discounts, rebates, off-invoice pricing, free goods (as described above), credit memos, consulting fees, debt forgiveness, and educational and promotional grants. All of these incentives were designed to lower the providers' net cost of purchasing the defendants' drugs.  The value of such services was kept "off the books," so as not to be reflected in the AWP, which in turn, inflates the AWP.

427.     The provision of such financial incentives lowered the actual acquisition cost of prescription drugs sold by defendants to their customers, raising the spread.  If properly reported as part of the average wholesale prices published by the pricing compendia, such financial incentives would have lowered the AWPs paid by payors like Plaintiff and the Class.

### J.     Concealment and Suppression of Unlawful Conduct

428.     The defendants' conduct at issue included efforts to conceal and suppress their unlawful acts and practices, so as to avoid detection and maintain their inflated AWPs as a basis for drug reimbursement.

429.     Defendants concealed their unlawful acts and practices from Plaintiff and the Class by controlling the process and methodology by which their AWPs were set.

430.     Defendants also prevented Plaintiff and the Class from learning what actual average wholesale prices were by insisting on contract confidentiality and secrecy by their customers, including medical providers, PBMs, and others who purchased their drugs.

431.     Defendants also worked behind-the-scenes with their government affairs employees, attorneys and lobbyists to ensure that confusion about AWP was maintained.

432.     Defendants' wrongful conduct also was of such a nature as to be self-concealing.

433.    The defendants have been aware of their wrongful acts and practices since at least 1991, and probably before that time.

434.    The defendants' failure to properly disclose their wrongful conduct, especially the AWP inflation and spread promotion acts and practices alleged herein, was and is willful, intentional, wanton, malicious, and outrageous.  It was and continues to be undertaken in deliberate disregard of, or with reckless indifference to, the rights and interests of Plaintiff and the Class.

## V.    FRAUDULENT CONCEALMENT AND TOLLING OF LIMITATIONS PERIOD

435.    All defendants have concealed from the public the details of their unfair and deceptive conduct during the time that they engaged in that conduct so as to avoid detection and cessation of their ill-gotten profits and benefits.

436.    Given the defendants' concealment of their unfair and deceptive conduct, Plaintiff and the Class had no way of knowing of their unlawful schemes, illegal promotional activities, illegal sales and marketing programs and conduct, kickbacks, payments or provision of illegal remuneration, illegal switching, conspiracies and concerted activities, or other unlawful conduct alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence.

437.    Plaintiff and the Class could not have discovered the unlawful conduct alleged herein at an earlier date by the exercise of due diligence because of the unfair and deceptive practices and techniques of secrecy employed by the defendants and their co-conspirators to avoid detection of, and to conceal, their unlawful conduct and conspiracies.  These techniques of secrecy included, but were not limited to, secret meetings and communications between the defendants and their co-conspirators, the making of misrepresentations and misstatements about

their conduct to governmental authorities and the public, secret kickbacks to physicians and providers, and other conduct alleged herein, all intentionally designed to avoid detection of their illegal schemes and activities.  To this day, all defendants continue to conceal the complete details of their conduct from the public, including Plaintiff and the Class.

438.    By reason of the foregoing, the claims of Plaintiff and members of the Class are timely under any applicable statute of limitations (as tolled by the filing of this Class Action Complaint) pursuant to the discovery rules and the doctrine of fraudulent concealment.

439.    Defendants' failure to properly disclose their unlawful conduct and conspiracies and other acts and omissions as alleged herein, was and is willful, wanton, malicious, outrageous, and unconscionable, and was and continues to be undertaken in deliberate disregard of, or with reckless indifference to, the rights and interests of Plaintiff and members of the Class.

## VI.    CLASS ACTION ALLEGATIONS

440.    Plaintiff and the Class hereby incorporate by reference thereto the preceding and following paragraphs hereof as if fully set forth herein.

441.    Plaintiff brings this action pursuant to Rule 23 of the Federal  Rules of Civil Procedure, on behalf of itself, and on behalf of a Class comprised of all natural persons and third party payors  nationwide  who made, or who incurred an obligation enforceable at the time of judgment to make, a payment for defendants' generic drugs, or who made reimbursements for defendants' generic drugs, based on AWPs that were inflated.

442.    Plaintiff also seeks certification of a Class pursuant to Fed.R.Civ.Proc. 23(b)(2) as Plaintiff seeks declaratory and injunctive relief.

443.    The Class Period is January 1991 to the present.

444.     Excluded from the Class are the defendants herein; any subsidiaries or affiliates of the defendants; the officers and directors of the defendants during the Class Period; members of the Individual defendants' immediate families; any person, firm, trust, corporation, officer, director of any individual or entity in which any defendant has a controlling interest or which is related to, or affiliated with, any of the defendants; and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party and governmental entities with respect to claims asserted for governmental damages.  Also excluded from the Class are those with whom the defendants had direct contracts for defendants' generic drugs.

### A.     Numerosity

445.     The Class consists of numerous individuals and entities throughout the United States, making individual joinder impractical, in satisfaction of Rule 23(a)(1).  .  The disposition of the claims of the Class members in a single class action will provide substantial benefits to all parties and to the Court.

### B.     Typicality

446.     The claims of the representative Plaintiff are typical of the claims of the Class, as required by Rule 23 (a)(3) in that the representative Plaintiff includes people and entities who, like all Class members, purchased and/or reimbursed the generic drugs at inflated prices based on AWPs.  The representative Plaintiff, like all Class members, has been damaged by the defendants' misconduct because, among other things, it paid prices for generic drugs that were higher than they would have been but for the defendants' improper actions, including their unlawful marketing of spread, inducing medical providers to make pharmacy decisions based on economic factors as opposed to purely medical factors, and reporting false AWPs.

C.   **Common Questions of Law and Fact**

447.   The factual and legal bases of each of the defendants' misconduct are common to the Class members and represent a common thread of misconduct resulting in injury to Plaintiff and the members of the Class.

448.   There are many questions of law and fact common to Plaintiff and the Class, and those questions predominate over any questions that may affect individual Class members, within the meaning of, and fulfilling, Rule 23(a)(2) and 23 (b)(2) and (3).  Common questions of law and fact include, but are not limited to, the following:

a.   whether the defendants engaged in a deceptive scheme of improperly inflating the AWPs for their generic drugs used by Plaintiff and the Class as the basis for reimbursement;

b.   whether the defendants artificially inflated the AWPs for these drugs;

c.   whether it was the policy and practice of the defendants to prepare marketing and sales materials that contained comparisons of the published AWPs and the spreads available;

d.   whether the defendants provided free samples of their drugs to providers, and whether the defendants instructed them to bill Plaintiff and the Class for those free samples;

e.   whether the defendants' provision of free samples to providers, with the intent that the providers bill Plaintiff and the Class for the free samples, was unlawful;

f.   whether the defendants paid financial inducements to providers and other intermediaries, with the effect of lowering their costs for drugs;

g.   whether the defendants engaged in a pattern and practice of paying illegal kickbacks, disguised as free goods, rebates, consulting fees, junkets and education grants to providers and other intermediaries;

h.   whether AWPs are used as a benchmark for negotiating payments by Third-Party Payors for generic drugs;

i.   whether  the defendants engaged in a pattern and practice that caused Plaintiff and the Class to make inflated payments for generic drugs based on a false AWP;

     j.    whether the defendants engaged in a pattern of deceptive and/or fraudulent activity intended to defraud Plaintiff and the Class; and

     k.    whether the defendants are liable to Plaintiff and the Class for damages for conduct actionable under the various state consumer protection statutes.

### D.    **Adequacy**

449.    Plaintiff will fairly and adequately represent and protect the interests of the Class, as required by Rule 23(a)(4).  Plaintiff has retained counsel with substantial experience in prosecuting nationwide consumer class actions.  Plaintiff and their counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so.  Neither Plaintiff nor their counsel has any interest adverse to those of the Class.

### E.    **Superiority**

450.    Plaintiff and members of the Class have all suffered, and will continue to suffer, harm and damages as a result of the defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3).  Absent a class action, most members of the Class likely would find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law.

451.    The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the Court and the litigants, and promotes consistency and efficiency of adjudication.

452.    Additionally, the defendants have acted and failed to act on grounds generally applicable to Plaintiff and the Class and require Court imposition of uniform relief to ensure compatible standards of conduct toward the Class, thereby making appropriate equitable relief to the Class as a whole within the meaning of Rules 23(b)(1) and (b)(2).

## VII.   CLAIMS

### COUNT I
### Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law

453.   Local 690 and the members of the Class who reside in Pennsylvania hereby incorporate by reference thereto the preceding and following paragraphs hereof as if fully set forth herein.

454.   The defendants have violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL") 73 P.S. § 201-1 *et seq.,* by their actions as more fully described herein.

455.   Local 690 and Pennsylvania members of the Class are empowered to bring this action on behalf of "persons" who have purchased defendants' PDDs and NPDDs at inflated prices and, as a result, have suffered, are suffering, and will continue to suffer irreparable harm as a result of the defendants' actions.

456.   "Persons" include, but are not limited to, natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities within the meaning of 73 P.S. § 201-2(2).

457.   Plaintiff and the Class are persons under the UTPCPL.  Pennsylvania-based third party payors and consumers are persons under the UTPCPL.

458.   Plaintiff and the Class have standing to bring this claim in that Local 690 and the Class are both end payors and purchasers/reimbursers of the defendants' prescription drugs. Local 690 and the Class perform these functions for both personal and business purposes, and in their representative capacity on behalf of, and for the benefit of, their consumer beneficiaries who,

in turn, make use of the prescription drugs primarily for personal, family and/or household purposes.

459.    In distributing, pricing, marketing and selling prescription drugs to beneficiaries of Local 690 and the Pennsylvania-based TPPs in the Class, as well as consumers not covered by such plans, and in engaging in the unlawful conduct more fully described herein, the defendants are engaging in trade or commerce that directly or indirectly harmed consumers in Pennsylvania within the meaning of 73 P.S. § 201-2(3).

460.    Specifically, the defendants, by engaging in the acts and practices set forth above, have done at least the following in violation of the UTPCPL:

    a.    unfairly and deceptively distributed, marketed and sold their drugs by reporting or contributing to the reporting of inflated prices, including the AWPs and/or WACS, which AWPs were utilized by Plaintiff and the Class in reimbursing drugs and were paid by consumers;

    b.    concealed and suppressed from Plaintiff and the Class the fact that AWP prices are set and controlled by them, and not the pricing compendia who publish the inflated AWPs, thereby causing a likelihood of confusion or misunderstanding as to the source of the pricing data; and

    c.    unfairly and deceptively distributed, priced, marketed, and sold their drugs by creating spreads and promoting spread profits on their drugs to medical providers and others in the chain of distribution of prescription drugs who realized such spread profits at the expense of Plaintiff and the Class.

461.    The defendants violated the UTPCPL and caused harm to Plaintiff and the Class:

    a.    each time the defendants reported false or inflated prices (AWPs and/or WACs) to the pricing compendia to whom Plaintiff and the Class look for pricing data;

    b.    each time an inflated AWP and/or WAC of the defendants was published by the pricing compendia to whom Plaintiff and the Class look for pricing data;

    c.    each time a medical provider charged a Pennsylvania patient at the inflated AWP value set by the defendants for their drugs;

d.     each time reimbursement was made by Plaintiff and the Class, or payment was made by Plaintiff and the Class, at an inflated AWP and/or WAC of the defendants;

e.     each time a provider, PBM, or other intermediary benefitted from any spread between the actual wholesale cost of such drugs and the inflated AWP value set by the defendants for drugs sold in Pennsylvania;

f.     each time free goods or other free drug products were provided to a purchaser of defendants' drugs with the knowledge or with reckless disregard for the fact that such goods lowered the ultimate price paid for drugs, and each time a medical provider charged a Pennsylvania patient for such free goods;

g.     each time a financial incentive was given to direct purchasers of defendants' drugs, PBMs, or other customers, and caused a Pennsylvania patient to be billed at the inflated AWP of the defendants; and

h.     each time defendants concealed their unfair and deceptive acts and practices from Plaintiff and the Class.

462.   The defendants' products reimbursed and/or purchased by Local 690and the Class were used for personal, family or household use.

463.   The defendants' conduct as more fully described herein constitutes unfair methods of competition and unfair or deceptive acts or practices within the meaning of 73 P.S. § 201-2(4), including, but not limited to, the following:

a.     causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or services, within the meaning of 73 P.S. § 201-2(4)(ii);

b.     representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have, within the meaning of 73 P.S. §201-2(4)(v);

c.     advertising goods or services with the intent not to sell them as advertised, within the meaning of 73 P.S. § 201-3(4)(ix);

d.     making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions, within the meaning of 73 P.S. § 201-2(4)(xi); and

87

e.  engaging in any other deceptive conduct which creates a likelihood of confusion or of misunderstanding, within the meaning of 73 P.S. § 201-2(4)(xxi).

464.  The defendants' conduct more fully described herein is proscribed and unlawful pursuant to 73 P.S. §201-3.

465.  The defendants are liable for their actions, and are jointly and severally liable for the actions of their co-conspirators, for each of these violations as independent, unfair and deceptive acts in violation of the UTPCPL, and for their course of conduct comprising an unfair and deceptive act or practice in violation of the UTPCPL.

466.  As a result of the defendants' unfair and deceptive acts and practices, Plaintiff and the Class have and will continue to suffer ascertainable losses and damages in an amount to be determined at trial, which amounts should be awarded pursuant to 73 P.S. §201-9.2.  These amounts should be trebled, in this Court's discretion, as appropriate.

WHEREFORE, Plaintiff, on behalf of itself, and on behalf of all similarly situated Pennsylvania consumers and TPPs, respectfully seeks the relief set forth below.

## COUNT II
## Violations of Consumer Fraud Laws of the DVHCC Member States

467.  Plaintiff and the Class hereby incorporate by reference thereto the preceding and following paragraphs hereof as if fully set forth herein.

468.  In addition to Pennsylvania where both the Plaintiff and the DVHCC reside, members of the DVHCC reside in California, the District of Columbia, Delaware, Indiana, Kentucky, Maryland, Massachusetts, Michigan, New Jersey, New York, Ohio, Wisconsin, and West Virginia.

469.     In addition to Pennsylvania, defendants are incorporated, maintain their principal places of business, reside, and/or maintain business operations in either California, Delaware, Maryland, Massachusetts, Michigan, New Jersey, and New York.

470.     Each of these states has enacted statutes to protect consumers against unfair, deceptive or fraudulent business practices, unfair competition and false advertising.  The statutes of these states, legally and substantively common, provide consumers with a private right of action.

471.     Plaintiff and the Class are consumers who purchased and/or reimbursed the cost of generic drugs for personal use.

472.     Defendants' conduct, as alleged in this Amended Complaint, constitutes unfair and deceptive acts or practices, unconscionable practices, fraud, false pretense, false promise, misrepresentation, concealment, suppression or omission of material fact in violation of these statutes.  Defendants' continuing violations include, among others:

(a)     Failing to disclose material facts in the conduct of trade or commerce in that they have not disclosed the truth about their pricing, marketing and sales of their generic drugs, and other acts and omissions;

(b)     Making false or misleading statements of fact concerning their generic drugs in that they have not disclosed the truth about their pricing, marketing and sales of generic drugs, and other acts and omissions.

473.     Defendants willfully engaged in such practices knowing them to be unfair and deceptive and with the intent that Plaintiff and the Class would rely on the reported average wholesale prices for defendants' generic drugs to their detriment.

474.    The wrongful conduct alleged in this Amended Complaint occurs, and continues to occur, in the ordinary course of defendants' businesses and has caused great harm to Plaintiff and the Class, who were foreseeable and direct victims.

475.    As a direct and legal result of defendants' misleading, unfair, and deceptive, trade practices, Plaintiff and the Class have sustained damages.

**1.    Violations of California Business & Professions Code § 17200 *et seq.* ("The Unfair Competition Act")**

476.    Plaintiff and the Class hereby incorporate by reference thereto the preceding and following paragraphs hereof as if fully set forth herein.

477.    Section 17200 of the California Business & Professions Code prohibits unfair competition by prohibiting any "unlawful, unfair or fraudulent business acts or practice..."

478.    Plaintiff and the Class have been injured as a direct and proximate result of defendants' unfair, unlawful, and/or fraudulent business practices as alleged above, and these proceedings are instituted pursuant to section 17203 and 17204 of the California Business and Professions Code individually, to obtain relief from defendants' business acts and practices that violate the Unfair Competition Act.

479.    The defendants' conduct as alleged herein violates the Unfair Competition Act. The business acts and practices of defendants constituted and constitute a common continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of the Unfair Competition Act including, but in no way limited to, representing the AWPs for their generic drugs as the average wholesale prices for such drugs when they knew the actual average wholesale prices were much lower.

90

480.    Defendants' business acts and practices are unfair, unlawful, and/or fraudulent to consumers and TPPs in the State of California within the meaning of Business and Professions Code section 17200.

481.    Defendants' acts and practices are fraudulent within the meaning of Business and Professions Code section 17200.

482.    Defendants' business acts and practices, as described above, whether or not in violation of Business and Professions Code section 17200 *et seq*. and whether or not the product of concerted action are otherwise unfair, unconscionable, unlawful and/or fraudulent.

483.    The illegal conduct alleged herein is continuing and there is no indication that defendants will not continue such activity into the future.

484.    The business acts and practices of defendants, as alleged herein, constituted and constitute a common continuous and continuing plan and scheme to deceive the public by means of unfair, unlawful and/or fraudulent business practices affecting the trade or commerce in violation of California Business & Professions Code, Section 17200, *et seq*.

485.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as alleged herein, constituted and constitute unfair, unlawful and/or fraudulent business practices within the meaning of California Business & Professions Code, Section 17200 *et seq*.

486.    Plaintiff and the members of the Class are entitled to relief, including full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by defendants as a result of such business acts or practices and enjoining defendants to cease and desist from engaging in the practices described herein.

487.    To prevent unjust enrichment pursuant to the California Business and Professions Code, defendants should be required to place all disgorged illegal gains and profits in a

constructive trust to be established by the court for the purpose of making full restitution to all injured parties.

WHEREFORE, Plaintiff, on behalf of itself, and on behalf of all similarly situated California consumers and TPPs, respectfully seeks the relief set forth below.

### 2. Violations of the Delaware Consumer Fraud Act (6 Del. Code § 2511, *et seq.*)

488. Plaintiff and the Class hereby incorporate by reference thereto the preceding and following paragraphs hereof as if fully set forth herein.

489. The Delaware Consumer Fraud Act provides for recovery by consumers of "deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise." 6 Del. Code § 2513(a).

490. The Delaware courts have held that the Act is to be liberally construed.

491. By the misrepresentations as to, non-disclosure, and concealment of material facts as alleged above, especially the true average wholesale prices for generic drugs, the defendants have violated the Delaware Consumer Fraud Act.

492. The misrepresentations, non-disclosure and concealment occurred with respect to the pricing, marketing and sales of generic drugs, and therefore occurred in trade or commerce.

493. But for the misrepresentations and non-disclosure of material facts relating to the pricing, marketing and sales of the generic drugs, Plaintiff and the Class would not have purchased the generic drugs at the inflated AWP-based prices that they did.

494. Defendants directly and proximately caused Plaintiff and the Class to suffer damages by, as described above, paying for the generic drugs at inflated AWP-based prices

92

without disclosure of information regarding the actual average wholesale prices for the generic

drugs.  Defendants' conduct directly and proximately caused Plaintiff and the Class to pay

exorbitant prices for the generic drugs.  Such conduct is actionable under Delaware's Consumer

Fraud Act.

495.    As a result of the defendants' unfair and deceptive trade practices throughout

Delaware, Plaintiff and the Class have and will continue to suffer damages in an amount to be

determined at trial.

WHEREFORE, Plaintiff, on behalf of itself, and on behalf of all similarly situated

Delaware consumers and TPPs, respectfully seeks the relief set forth below.

### 3.    Violations of the District of Columbia Consumer Protection Procedures Act ("CPPA")(D.C. Code § 28-3901, *et seq*)

496.    Plaintiff and the Class hereby incorporate by reference thereto the preceding and

following paragraphs hereof as if fully set forth herein.

497.    The section governing unlawful trade practices, D.C. Code § 28-3904, provides,

in pertinent part, that it "shall be a violation of this chapter, whether or not any consumer is in

fact misled, deceived or damaged thereby, for any person to", among other things, "misrepresent

as to a material fact which has a tendency to mislead" or "fail to state a material fact if such

failure tends to mislead".  D.C. Code § 28-3904 (e)-(f).

498.    Here, defendants affirmatively misrepresented that average wholesale prices for

their generic drugs.  Further, they did not disclose that the actual average wholesale prices were

much lower than the AWPs they reported to the pricing compendia.

499.    By the misrepresentations as to, non-disclosure, and concealment of material facts

as alleged above, especially the true average wholesale prices for generic drugs, the defendants

have violated the CPPA.

93

500.     But for the misrepresentations and non-disclosure of material facts relating to the pricing, marketing and sales of the generic drugs, Plaintiff and the Class would not have purchased the generic drugs at the inflated AWP-based prices that they did.

501.     Defendants directly and proximately caused Plaintiff and the Class to suffer damages by, as described above, paying for the generic drugs at inflated AWP-based prices without disclosure of information regarding the actual average wholesale prices for the generic drugs.  Defendants' conduct directly and proximately caused Plaintiff and the Class to pay exorbitant prices for the generic drugs.  Such conduct is actionable under CPPA.

502.     As a result of the defendants' unfair and deceptive trade practices throughout Delaware, Plaintiff and the Class have and will continue to suffer damages in an amount to be determined at trial.

WHEREFORE, Plaintiff, on behalf of itself, and on behalf of all similarly situated consumers and TPPs in the District of Columbia, respectfully seeks the relief set forth below.

### 4.     Violations of the Indiana Deceptive Consumer Sales Act (Ind. Code Ann. § 24-5-0.5.1, *et seq.*)

503.     Plaintiff and the Class hereby incorporate by reference thereto the preceding and following paragraphs hereof as if fully set forth herein.

504.     "A supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction.  Such an act, omission, or practice by a supplier is a violation of [the Act] whether it occurs before, during, or after the transaction.  An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations."   Ind. Code Ann. § 24-5-0.5-3(a).

505.     Similar to Pennsylvania's UTPCPL, the Indiana act prohibits merchants from engaging in certain conduct which is considered *per se* as deceptive.  Ind. Code Ann. 24-5-0.5-3(a) sets forth a series of proscribed practices.

506.     These enumerated proscribed practices are not intended to be exhaustive.

507.     Here, defendants affirmatively misrepresented that average wholesale prices for their generic drugs.  Further, they did not disclose that the actual average wholesale prices were much lower than the AWPs they reported to the pricing compendia.

508.     By the misrepresentations as to, non-disclosure, and concealment of material facts as alleged above, especially the true average wholesale prices for generic drugs, the defendants have violated the "Indiana Deceptive Consumer Sales Act".

509.     But for the misrepresentations and non-disclosure of material facts relating to the pricing, marketing and sales of the generic drugs, Plaintiff and the Class would not have purchased the generic drugs at the inflated AWP-based prices that they did.

510.     Defendants directly and proximately caused Plaintiff and the Class to suffer damages by, as described above, paying for the generic drugs at inflated AWP-based prices without disclosure of information regarding the actual average wholesale prices for the generic drugs.  Defendants' conduct directly and proximately caused Plaintiff and the Class to pay exorbitant prices for the generic drugs.  Such conduct is actionable under "Indiana Deceptive Consumer Sales Act".

511.     As a result of the defendants' unfair and deceptive trade practices throughout Indiana, Plaintiff and the Class have and will continue to suffer damages in an amount to be determined at trial.

WHEREFORE, Plaintiff, on behalf of itself, and on behalf of all similarly situated Indiana consumers and TPPs, respectfully seeks the relief set forth below.

**5.    Violations of Kentucky Consumer Protection Act (KRS 367.170)**

512.    Plaintiff and the Class hereby incorporate by reference thereto the preceding and following paragraphs hereof as if fully set forth herein.

513.    The Commonwealth of Kentucky has enacted laws to protect consumers against unfair, deceptive or fraudulent business practices, unfair competition and false advertising.  KRS 367.170 (1) provides:  "Unfair, false, misleading or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

514.    By the misrepresentations as to, non-disclosure, and concealment of material facts as alleged above, especially the true average wholesale prices for generic drugs, the defendants have engaged in "unfair, false, misleading or deceptive acts or practices, in violation of KRS 367.170.

515.    The misrepresentations, non-disclosure and concealment occurred with respect to the pricing, marketing and sales of generic drugs, and therefore occurred in trade or commerce.

516.    But for the misrepresentations and non-disclosure of material facts relating to the pricing, marketing and sales of the generic drugs, Plaintiff and the Class would not have purchased the generic drugs at the inflated AWP-based prices that they did.

517.    Defendants directly and proximately caused Plaintiff and the Class to suffer damages by, as described above, paying for the generic drugs at inflated AWP-based prices without disclosure of information regarding the actual average wholesale prices for the generic drugs.  Defendants' conduct directly and proximately caused Plaintiff and the Class to pay

exorbitant prices for the generic drugs. Such conduct is actionable under Kentucky's Consumer Protection Law.

518.    As a result of the defendants' unfair and deceptive trade practices throughout Kentucky, Plaintiff and the Class have and will continue to suffer damages in an amount to be determined at trial.

WHEREFORE, Plaintiff, on behalf of itself, and on behalf of all similarly situated Kentucky consumers and TPPs, respectfully seeks the relief set forth below.

**6.    Violations of the Maryland Consumer Protection Act (Md. Com. Law Code § 13-101, *et seq.*)**

519.    Plaintiff and the Class hereby incorporate by reference thereto the preceding and following paragraphs hereof as if fully set forth herein.

520.    The State of Maryland has enacted laws to protect consumers. The Consumer Protection Act was passed in response to "mounting concerns over the increase of deceptive practices in connection with the sales of merchandise, real property, and services and the extension of credit". The General Assembly found existing federal and state laws to be "inadequate, poorly coordinated and not widely known or adequately effaced," and found "that improved enforcement procedures [were] necessary to help alleviate the growing problem of deceptive consumer practices."

521.    The Act prohibits certain unfair and deceptive practices "in the sale…of any consumer goods". The Act provides for private causes of action. §13-408(a).

522.    Here, defendants affirmatively misrepresented that average wholesale prices for their generic drugs. Further, they did not disclose that the actual average wholesale prices were much lower than the AWPs they reported to the pricing compendia.

523. By the misrepresentations as to, non-disclosure, and concealment of material facts as alleged above, especially the true average wholesale prices for generic drugs, the defendants have violated the "Consumer Protection Act".

524. But for the misrepresentations and non-disclosure of material facts relating to the pricing, marketing and sales of the generic drugs, Plaintiff and the Class would not have purchased the generic drugs at the inflated AWP-based prices that they did.

525. Defendants directly and proximately caused Plaintiff and the Class to suffer damages by, as described above, paying for the generic drugs at inflated AWP-based prices without disclosure of information regarding the actual average wholesale prices for the generic drugs. Defendants' conduct directly and proximately caused Plaintiff and the Class to pay exorbitant prices for the generic drugs. Such conduct is actionable under the "Consumer Protection Act".

526. As a result of the defendants' unfair and deceptive trade practices throughout Maryland, Plaintiff and the Class have and will continue to suffer damages in an amount to be determined at trial.

WHEREFORE, Plaintiff, on behalf of itself, and on behalf of all similarly situated Maryland consumers and TPPs, respectfully seeks the relief set forth below.

**7. Violations of the Massachusetts Consumer Fraud Law (M.G.L.A 93A, §2, *et. seq.*)**

527. Plaintiff and the Class hereby incorporate by reference thereto the preceding and following paragraphs hereof as if fully set forth herein.

528. The Commonwealth of Massachusetts has enacted laws to protect consumers against unfair, deceptive or fraudulent business practices, unfair competition and false advertising.

529.     M.G.L.A 93A, §2 provides:  "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

530.     By the misrepresentations as to, non-disclosure, and concealment of material facts as alleged above, the defendants have engaged in unfair or deceptive acts or practices, and deceived and continue to deceive consumers like the Plaintiff and the  Class.  This conduct constitutes unfair competition and/or unfair, deceptive acts or fraudulent acts or practices in violation of M.G.L.A 93A, *et seq.*

531.     The misrepresentations, non-disclosure and concealment occurred with respect to the pricing, marketing and sales of generic drugs, and therefore occurred in trade or commerce.

532.     Defendants' unfair or deceptive acts or practices and misleading misrepresentations and non-disclosure of material facts relating to the pricing of the generic drugs caused Plaintiff and the Class to purchase the generic drugs at inflated prices based on AWP.

533.     But for the misrepresentations and non-disclosure of material facts relating to the pricing, marketing and sales of the generic drugs, Plaintiff and the Class would not have paid prices based on the inflated AWPs for the generic drugs.

534.     Defendants directly and proximately caused Plaintiff and the Class to suffer damages by, as described above, paying inflated prices for the generic drugs without disclosure of information regarding the actual pricing of the generic drugs.  Defendants' conduct directly and proximately caused Plaintiff and the Class to pay exorbitant prices for the generic drugs. Such conduct is actionable under Massachusetts Consumer Protection Law.

535.    As a result of the defendants' unfair and deceptive trade practices throughout Massachusetts, Plaintiff and the Class have and will continue to suffer damages in an amount to be determined at trial.

WHEREFORE, Plaintiff, on behalf of itself, and on behalf of all similarly situated Massachusetts consumers and TPPs, respectfully seeks the relief set forth below.

### 8.    Violations of the Michigan Consumer Protection Act ("MCPA")  (Mich. Stat. § 445.901, *et seq.*)

536.    Plaintiff and the Class hereby incorporate by reference thereto the preceding and following paragraphs hereof as if fully set forth herein.

537.    The Michigan Consumer Protection Act ("MCPA") prohibits "unfair, unconscionable or deceptive" business practices and  provides a list of offenses that constitute such practices.  Mich. Stat. §§445.903. Prohibited practices include "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not be reasonably known by the consumer" and "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is." Mich. Stat. §§445.903(1)(S), (bb).

538.    The Act is broad in scope because it prohibits "non only 'deceptive' business practices but also those which are 'unfair' and 'unconscionable'".

539.    By deliberately publishing inflated AWPs, defendants intended to rely upon such AWPs in their transactions for generic drugs.  Plaintiff and the Class relied on such AWPs to their detriment.

540.    Here, defendants affirmatively misrepresented that average wholesale prices for their generic drugs.  Further, they did not disclose that the actual average wholesale prices were much lower than the AWPs they reported to the pricing compendia.

541.   By the misrepresentations as to, non-disclosure, and concealment of material facts as alleged above, especially the true average wholesale prices for generic drugs, the defendants have violated the "MCPA".

542.   But for the misrepresentations and non-disclosure of material facts relating to the pricing, marketing and sales of the generic drugs, Plaintiff and the Class would not have purchased the generic drugs at the inflated AWP-based prices that they did.

543.   Defendants directly and proximately caused Plaintiff and the Class to suffer damages by, as described above, paying for the generic drugs at inflated AWP-based prices without disclosure of information regarding the actual average wholesale prices for the generic drugs.   Defendants' conduct directly and proximately caused Plaintiff and the Class to pay exorbitant prices for the generic drugs.   Such conduct is actionable under "MCPA".

544.   As a result of the defendants' unfair and deceptive trade practices throughout Michigan, Plaintiff and the Class have and will continue to suffer damages in an amount to be determined at trial.

WHEREFORE, Plaintiff, on behalf of itself, and on behalf of all similarly situated Michigan consumers and TPPs, respectfully seeks the relief set forth below.

**9.   Violations of New Jersey Consumer Fraud Act (N.J. Stat. Ann. § 56:8-1, *et seq.*)**

545.   Plaintiff and the Class hereby incorporate by reference thereto the preceding and following paragraphs hereof as if fully set forth herein.

546.   New Jersey has enacted laws to protect consumers against unfair, deceptive or fraudulent business practices, unfair competition and false advertising.   New Jersey allows consumers a private right of action under such laws.

547.   By the misrepresentations and non-disclosure of material facts alleged above, the defendants deceived and continue to deceive Plaintiff and the Class.  This conduct constitutes unconscionable, unlawful, unfair, deceptive and/or fraudulent business practices within the meaning of the New Jersey Consumer Fraud Act, 56:8-1, *et seq*.

548.   In addition, the defendants' continuous and systematic reporting of inflated AWPs for their generic drugs to the pricing compendia and other conduct as alleged above, constitutes an unconscionable business practice, unfair competition and unfair, deceptive, untrue, or misleading advertising within the meaning of  the New Jersey Consumer Fraud Act, 56:8-1, *et seq*.

549.   Here, defendants affirmatively misrepresented that average wholesale prices for their generic drugs.  Further, they did not disclose that the actual average wholesale prices were much lower than the AWPs they reported to the pricing compendia.

550.   By the misrepresentations as to, non-disclosure, and concealment of material facts as alleged above, especially the true average wholesale prices for generic drugs, the defendants have violated the "CFA".

551.   But for the misrepresentations and non-disclosure of material facts relating to the pricing, marketing and sales of the generic drugs, Plaintiff and the Class would not have purchased the generic drugs at the inflated AWP-based prices that they did.

552.   Defendants directly and proximately caused Plaintiff and the Class to suffer damages by, as described above, paying for the generic drugs at inflated AWP-based prices without disclosure of information regarding the actual average wholesale prices for the generic drugs.  Defendants' conduct directly and proximately caused Plaintiff and the Class to pay exorbitant prices for the generic drugs.  Such conduct is actionable under "CFA".

553.     As a result of the defendants' unfair and deceptive trade practices throughout New Jersey, Plaintiff and the Class have and will continue to suffer damages in an amount to be determined at trial.

WHEREFORE, Plaintiff, on behalf of itself, and on behalf of all similarly situated New Jersey consumers and TPPs, respectfully seeks the relief set forth below.

**10.     Violations of New York General Business Law (N.Y. Gen. Bus. Law § 349, *et seq.*)**

554.     Plaintiff and the Class hereby incorporate by reference thereto the preceding and following paragraphs hereof as if fully set forth herein.

555.     Defendants' conduct as alleged in this Amended Complaint constitutes deceptive acts or practices in violation of New York General Business Law §349.

556.     By the untrue, deceptive, and misleading misrepresentations and non-disclosure of material facts relating to the pricing of generic drugs alleged above, the defendants deceived and continue to deceive consumers, such as Plaintiff and the Class, and the general public. This conduct constitutes unfair methods of competition and unfair or deceptive acts or practices within the meaning of the GBL § 349, and warrants the application of the laws of New York to defendants in this Court.

557.     The unfair methods of competition, unfair and deceptive misleading misrepresentations, and non-disclosure of material facts by the defendants caused the Plaintiff and the Class to suffer losses within the meaning of statute prohibiting deceptive acts and practices, GBL § 349.  Specifically, defendants' untrue, deceptive, and misleading misrepresentations and non-disclosure of material facts relating to the pricing of generic drugs caused Plaintiff and the Class to purchase generic drugs at inflated prices.

558. But for the misrepresentations and non-disclosure of material facts relating to the pricing, marketing and sales of the generic drugs, Plaintiff and the Class would not have paid prices based on the inflated AWPs for the generic drugs.

559. Defendants directly and proximately caused Plaintiff and the Class to suffer damages by, as described above, paying inflated prices for the generic drugs without disclosure of information regarding the actual pricing of the generic drugs. Defendants' conduct directly and proximately caused Plaintiff and the Class to pay exorbitant prices for the generic drugs. Such conduct is actionable under the New York statute prohibiting deceptive acts and practices, GBL § 349.

WHEREFORE, Plaintiff, on behalf of itself, and on behalf of all similarly situated New York consumers and TPPs, respectfully seeks the relief set forth below.

**11.    Violations of Ohio's Consumer Sales Practices Act (Ohio Revised Code §1345.01 *et seq*)**

560. Plaintiff and the Class hereby incorporate by reference thereto the preceding and following paragraphs hereof as if fully set forth herein.

561. The Ohio Consumer Sales Practices Act, Ohio Revised Code §1345.01 *et seq.,* prohibits unfair methods of competition and unfair and deceptive acts or practices, including, *inter alia,* "the use or employment of any deceptions, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression or omission of any material fact, whether any person has in fact been misled, deceived, or damaged thereby." The Ohio Consumer Sales Practices Act is to be liberally construed.

562. By the untrue, deceptive, and misleading misrepresentations and non-disclosure of material facts relating to the pricing of generic drugs alleged above, the Defendants deceived and continue to deceive consumers, such as Plaintiff and the Class, and the general public. This

conduct constitutes unfair methods of competition and unfair or deceptive acts or practices within the meaning of the Ohio Consumer Sales Practices Act.

563.     The unfair methods of competition, unfair and deceptive misleading misrepresentations, and non-disclosure of material facts by the defendants caused the Plaintiff and the Class to suffer losses within the meaning of statute prohibiting deceptive acts and practices, the Ohio Consumer Sales Practices Act.  Specifically, defendants' untrue, deceptive, and misleading misrepresentations and non-disclosure of material facts relating to the pricing of generic drugs caused Plaintiff and the Class to purchase generic drugs at inflated prices.

564.     But for the misrepresentations and non-disclosure of material facts relating to the pricing, marketing and sales of the generic drugs, Plaintiff and the Class would not have paid prices based on the inflated AWPs for the generic drugs.

565.     Defendants directly and proximately caused Plaintiff and the Class to suffer damages by, as described above, paying inflated prices for the generic drugs without disclosure of information regarding the actual pricing of the generic drugs.  Defendants' conduct directly and proximately caused Plaintiff and the Class to pay exorbitant prices for the generic drugs. Such conduct is actionable under the Ohio statute prohibiting deceptive acts and practices, the Ohio Consumer Sales Practices Act.

WHEREFORE, Plaintiff, on behalf of itself, and on behalf of all similarly situated Ohio consumers and TPPs, respectfully seeks the relief set forth below.

**12.     Violations of Wisconsin Consumer Fraud Law (Wis. Stat. § 100.18, *et seq.*)**

566.     Plaintiff and the Class hereby incorporate by reference thereto the preceding and following paragraphs hereof as if fully set forth herein.

567.     WISCONSIN STAT. § 100.18 provides in relevant part:

" No … corporation …, with intent to sell, distribute, increase the consumption of or in any wise dispose of any real estate, merchandise, securities, employment, service, or anything offered by such … corporation …, directly or indirectly, to the public for sale, … shall make, publish, disseminate, circulate, or place before the public, … in this state, … an advertisement, announcement, statement or representation of any kind to the public relating to such … sale … of such real estate, merchandise, securities, service or employment …, which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading."

Section 100.18(1).

568.    The statute further provides that "any person suffering pecuniary loss because of a violation of this section … may sue in any court of competent jurisdiction and shall recover such pecuniary loss, together with costs, including reasonable attorney fees." WIS. STAT. § 100.18(11)(b)2.

569.    Here, defendants affirmatively misrepresented that average wholesale prices for their generic drugs.  Further, they did not disclose that the actual average wholesale prices were much lower than the AWPs they reported to the pricing compendia.

570.    By the misrepresentations as to, non-disclosure, and concealment of material facts as alleged above, especially the true average wholesale prices for generic drugs, the defendants have violated the "Winsconsin Act".

571.    But for the misrepresentations and non-disclosure of material facts relating to the pricing, marketing and sales of the generic drugs, Plaintiff and the Class would not have purchased the generic drugs at the inflated AWP-based prices that they did.

572.    Defendants directly and proximately caused Plaintiff and the Class to suffer damages by, as described above, paying for the generic drugs at inflated AWP-based prices without disclosure of information regarding the actual average wholesale prices for the generic

drugs. Defendants' conduct directly and proximately caused Plaintiff and the Class to pay exorbitant prices for the generic drugs. Such conduct is actionable under the "Wisconsin Act".

573. As a result of the defendants' unfair and deceptive trade practices throughout Wisconsin, Plaintiff and the Class have and will continue to suffer damages in an amount to be determined at trial.

WHEREFORE, Plaintiff, on behalf of itself, and on behalf of all similarly situated Wisconsin consumers and TPPs, respectfully seeks the relief set forth below.

### 13. Violations of West Virginia's Consumer Credit and Protection Act (W. Va. Code § 46A-6-101, *et seq.*)

574. Plaintiff and the Class hereby incorporate by reference thereto the preceding and following paragraphs hereof as if fully set forth herein.

575. West Virginia has enacted statutes to protect consumers against unfair, deceptive and fraudulent acts or practices. *See* 46A-6-101(1).

576. West Virginia allows consumers a private right of action under these statutes. *See* 46A-6-106(a).

577. West Virginia's Consumer Protection Act provides in pertinent part that:

> The Legislature hereby declares that the purpose of this article is to complement the body of federal law governing unfair competition and unfair, deceptive and fraudulent acts or practices in order to protect the public and foster fair and honest competition. It is the intent of the Legislature that, in construing this article, the courts be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters. To this end, this article shall be liberally construed so that its beneficial purposes may be served.

46A-6-101(1).

578.    The Act provides that unfair methods of competition and unfair or deceptive acts or practices means and includes, but is not limited to, any one or more of some sixteen specified acts or practices.  *See* 46A-6-102(7).

579.    By the misrepresentations as to, non-disclosure, and concealment of material facts as alleged above, the defendants have engaged in "unfair, deceptive and fraudulent acts or practices" in violation of 46A-6-101(1).

580.    Defendants, by engaging in the conduct described above, perpetrated in connection with the sale of the generic drugs, violated and continue to violate the West Virginia Consumer Credit and Protection Act.

581.    The unfair, deceptive and fraudulent acts or practices include misrepresentations, concealment and other non-disclosures of material facts by the defendants which caused the Plaintiff and the Class to suffer losses within the meaning of the aforementioned Code.

582.    By the untrue, deceptive, and misleading misrepresentations and non-disclosure of material facts relating to the pricing of generic drugs alleged above, the defendants deceived and continue to deceive consumers, such as Plaintiff and the Class, and the general public. This conduct constitutes unfair methods of competition and unfair or deceptive acts or practices within the meaning of the Code.

583.    The unfair methods of competition, unfair and deceptive misleading misrepresentations, and non-disclosure of material facts by the defendants caused the Plaintiff and the Class to suffer losses within the meaning of the Code.  Specifically, defendants' untrue, deceptive, and misleading misrepresentations and non-disclosure of material facts relating to the pricing of generic drugs caused Plaintiff and the Class to purchase generic drugs at inflated prices.

584.     But for the misrepresentations and non-disclosure of material facts relating to the pricing, marketing and sales of the generic drugs, Plaintiff and the Class would not have paid prices based on the inflated AWPs for the generic drugs.

585.     Defendants directly and proximately caused Plaintiff and the Class to suffer damages by, as described above, paying inflated prices for the generic drugs without disclosure of information regarding the actual pricing of the generic drugs.  Defendants' conduct directly and proximately caused Plaintiff and the Class to pay exorbitant prices for the generic drugs. Such conduct is actionable under the Code.

WHEREFORE, Plaintiff, on behalf of itself, and on behalf of all similarly situated West Virginia consumers and TPPs, respectfully seeks the relief set forth below.

## COUNT III
### Violations of the Consumer Protection Laws of Other States

586.     Plaintiff and the Class hereby incorporate by reference thereto the preceding and following paragraphs hereof as if fully set forth herein.

587.     All of the remaining states and Puerto Rico have enacted statutes to protect consumers against unfair, unconscionable, deceptive or fraudulent business practices, unfair competition and false advertising.  The below-listed states and U.S. territory allow consumers a private right of action under these statutes.

588.     As a result, consumers and TPPs in the following states and Puerto Rico are included in the Class in this case:

(a)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ala. Code § 8-19-5(5), *et seq.;*

(b)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq.*;

(c)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq.*;

(d)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*;

(e)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*;

(f)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*;

(g)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. ' 501.201 (2006), *et seq.,*

(h)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga. Stat. § 10-1-393, *et seq.*;

(i)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*;

(j)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*;

(k)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS 505/1, *et seq.,*

(l)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Iowa Code § 714.16.2(a), *et seq.*;

(m)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*;

(n)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Louisiana law, LSA-R.S. § 51:1405, *et. seq.*;

(o)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207(1), *et seq.*;

(p)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Mo. Rev. Stat. § 407.010, *et seq.*;

(q)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, *et seq.*;

(r)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Miss. Code § 75-24-5(1), *et seq.*;

(s)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code § 30-14-103, *et seq.;*

(t)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*;

(u)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*;

(v)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*

(w)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C.G.S.A § 75-1.1, *et seq.*,

(x)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*;

(y)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made representations in violation of Okla. Stat. tit. 15 § 751, *et seq.*;

(z)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*;

(aa)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Puerto Rico's consumer protection laws;

(bb)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, *et seq.*;

(cc)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*;

(dd)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*;

(ee)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*;

(ff)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*;

(gg)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-1 1-1, *et seq.*;

(hh)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9, § 245 1, *et seq.*;

(ii)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-200(A), *et seq.*;

(jj)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wash. Rev. Code ' 19.86.010, *et seq.,*

(kk)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. § 40-12-100, *et seq.*

WHEREFORE, Plaintiff, on behalf of itself, and on behalf of all similarly situated consumers and TPPs located in the above-listed states, respectfully seeks the relief set forth below.

## COUNT IV
## Negligent Misrepresentation/Fraud

589.   Plaintiff and the Class hereby incorporate by reference thereto the preceding and following paragraphs hereof as if fully set forth herein.

590.   Defendants' acts violate Pennsylvania common law against negligent misrepresentation and fraud.

591.   In reporting inflated WACs and/or AWPs to the compendia throughout the relevant time period for their generic drugs, the defendants were making representations that the WACs and AWPs for each of their drugs represented a calculation of a real and fact-based average wholesale prices and wholesale acquisition costs for their drugs.

592.   These representations were material to the transactions at hand in that Plaintiff and the Class used and relied upon the AWPs as the basis for determining how much to pay and/or reimburse for the defendants' drugs.

593.    As set forth more fully above, these AWPs were artificial prices, unrelated to any average wholesale price (or other average), created and manipulated by the defendants for the purpose of generating revenue, thus constituting false representations which the defendants knew or, in the absence of recklessness, should have known to be false.

594.    The value of free products and other incentives given by the defendants was not reflected in the setting of the AWP.  Indeed, the AWP was not a calculation of any average at all but in fact was a result-driven number selected exclusively by the defendants for the purpose of creating a spread for PDDs and NPDDs to induce the purchase of their drugs.

595.    Therefore, the defendants knew or, in the absence of recklessness, should have known that the omission of the value of free products in the reporting of AWP to the compendia and other incentives and the artificial setting of AWP constituted false representations.

596.    The defendants made these false representations with the intent of misleading Plaintiff and the Class into relying on AWP as a real and fact-based price, rather than an artificially inflated price.

597.    Plaintiff and the Class justifiably relied upon these false misrepresentations in purchasing and/or reimbursing for the defendants' drugs in an amount and for a price based upon the AWP.

598.    Plaintiff's and the Class' contracts cite AWP, as published by the compendia, in reimbursement formulas.

599.    As a direct result of the false representations of the defendants, as set forth above, Plaintiff and the Class were harmed in that they were unaware of the artificial inflation of the AWP, would not have paid and/or reimbursed the artificially inflated prices for the defendants'

drugs had they known of the false representations and, in fact, overpaid for the defendants' drugs because of the false representations.

WHEREFORE, Plaintiff, on behalf of itself, and on behalf of all similarly situated consumers and TPPs, respectfully seeks the relief set forth below.

## COUNT V
## Unjust Enrichment

600.     Plaintiff and the Class hereby incorporate by reference thereto the preceding and subsequent paragraphs hereof as if fully set forth herein.

601.     As set forth herein, defendants have been unjustly enriched as a result of engaging in the following practices with respect to Plaintiff and the Class: (1) establishing and reporting AWPs to the pricing compendia that do not reflect discounts, rebates and other financial incentives, and changing AWPs without accounting for such discounts, rebates and other financial incentives; (2) increasing the prices for certain of their generic drugs by exorbitant rates over a short time frame, without justification, (3) creating and promoting spreads for their drugs with inflated AWPs; (4) providing free goods and free drug products with the knowledge, expectation and/or reckless disregard for the fact that providers could and would bill for such products at inflated AWPs; (5) providing other financial incentives to reduce actual average wholesale prices without taking account of such reductions in the reported AWPs; and (6) concealing and suppressing the truth about their acts and practices.

602.     Plaintiff and the Class are purchasers, reimbursers and/or payors of defendants' drugs and have paid amounts far in excess of the true cost for such drugs.

603.     Defendants knew of, and have appreciated and retained, or used, the benefits of Plaintiff and the Class' purchases of their drugs at amounts far in excess of the true cost.

604.    Defendants used the spread between inflated AWPs and the actual selling prices of their drugs to pay prescribers an incentive to prescribe and dispense their high-priced drugs, as opposed to equally effective, but cheaper, alternative drugs and methods of treatment.  These incentives were intended to increase the sales and market shares of defendants' drugs, thereby increasing defendants' profits.

605.    For those customers that purchase directly from the defendants at prices based on AWPs, defendants' increases in reported AWPs directly benefit them in the form of increased revenue.

606.    Based upon defendants' conduct set forth in this Complaint, it would be inequitable and unjust for defendants to retain such benefits without payment of value.

607.    Defendants will be unjustly enriched if they are permitted to retain the direct or indirect benefits they received or used resulting from the purchase of defendants' drugs by Plaintiff and the Class.  Plaintiff, on behalf of itself and consumers such as members of the Class, seek to recover the amounts that unjustly enriched the defendants.

608.    Plaintiff and the Class are therefore entitled to equitable relief in the form of an injunction, restitution and disgorgement, legal relief in the form of damages, and any other relief the Court deems appropriate under the circumstances.

WHEREFORE, Plaintiff, on behalf of itself, and on behalf of all similarly situated Pennsylvania consumers and TPPs, respectfully seeks the relief set forth below.

## COUNT VI
## Civil Conspiracy

609.    Plaintiff and the Class hereby incorporate by reference thereto the preceding and following paragraphs hereof as if fully set forth herein.

610.    As set forth more fully above, beginning at least as early as 1991, the exact date being unknown to the Plaintiff, and continuing thereafter until the present, defendants, between and among themselves and others, entered into an agreement and/or otherwise engaged in a continuing conspiracy to deceive Plaintiff and the Class by causing them to pay more for defendants' drugs than they otherwise would have in the absence of defendants' conspiracy.

611.    Pursuant to the unfair and deceptive marketing and sales scheme and conspiracy alleged herein, and in furtherance thereof, defendants and their co-conspirators engaged in a wide range of activities, the purpose and effect of which was to deceive Plaintiff and the Class, and acted or took substantial steps in furtherance of the conspiracy.  Those acts include the following:

   a.    Defendants discussed and agreed among themselves and with their co-conspirators that they would inflate the prices for their drugs, including their AWPs and/or WACs;

   b.    Defendants agreed that they would set the AWPs for their generic drugs at least 10% below the brand AWP;

   c.    Defendants coordinated their recent generic pricing moves leading to the price gouging alleged herein;

   d.    Defendants discussed and agreed among themselves and with their co-conspirators that they would establish and promote spreads between the inflated AWPs and the actual acquisition costs for their drugs as an inducement for providers and other purchasers to prescribe, or cause to be prescribed, and to sell, or cause to be sold, their drugs instead of drugs of competitors or alternative modes and methods of healthcare treatment;

   e.    Defendants discussed and agreed among themselves and with their co-conspirators that they would provide free goods and other free drug products to purchasers of their drugs which helped reduce the actual average wholesale costs of the drugs;

   f.    Defendants discussed and agreed among themselves and with their co-conspirators that they would provide other inducements and financial incentives to purchasers of their drugs; and

116

g.  Defendants discussed and agreed among themselves and with their co-conspirators that they would conceal and suppress the truth about their inflated prices, their recent price gouging, the spreads for their drugs, and the monies earned by their customers from such spreads, and their other unlawful conduct alleged herein.

612.   In addition to the specific facts set forth above, upon information and belief, the defendants engaged in conspiratorial meetings, among the purposes of which meetings were to discuss the importance of controlling AWPs, setting generic AWPs at a consistent level below the brand (i.e., at least AWP minus 10%), maintaining inflated AWPs, maintaining AWPs as a basis for reimbursement, and impeding efforts to learn the truth, all in an effort to increase their individual profits and market share at the expense of payors for their drugs, like the Plaintiff and the Class.  Indeed, fourteen (14) defendants all refused to respond to Congress' letters investigating generic price gouging.  Further, the executives of three (3) defendants all declined to appear before Congress, agreeing to have a generic drug industry trade association representative appear in their place.

613.   Conspiratorial meetings, conferences, telephone and other communications were held between and among the defendants, and with their trade association, for the purpose of discussing the improper sales and marketing practices set forth herein, and the concealment of the truth alleged herein.

614.   Defendants performed the conspiratorial acts set forth herein intending to injure reimbursers and payors of their drugs, including Plaintiff and the Class, by causing them to pay artificially inflated prices for defendants' drugs based upon inflated AWPs.  Indeed, in the face of direct statements by Congressman Cummings about the harm the recent price gouging conduct was causing Medicaid and consumers, the fourteen (14) defendants investigated by Congress all agreed to remain silent and to conceal the truth.

615.    Defendants performed the acts alleged herein in furtherance of the common plan or design for the conspiracy with intent, malice and/or with knowledge of the injury and damage it would cause to the Plaintiff and the Class with knowledge and intent to cause such injuries and/or with reckless disregard for the consequences.

616.    As a direct and proximate result of the defendants' conspiracy as alleged herein, Plaintiff and the Class have been injured and damaged, and defendants are jointly and severally liable for such injuries and damages.

WHEREFORE, Plaintiff, on behalf of itself, and on behalf of all similarly situated Pennsylvania consumers and TPPs, respectfully seeks the relief set forth below.

## COUNT VII
## Aiding and Abetting

617.    Plaintiff and the Class hereby incorporate by reference thereto the preceding and following paragraphs hereof as if fully set forth herein.

618.    The defendants in this Complaint participated as co-conspirators in the violations alleged in this Complaint and performed acts and made statements in furtherance thereof. defendants acted as co-conspirators for each other and aided, abetted, or participated with one another, and others, in the commission of the wrongful acts alleged herein, or otherwise caused the damages suffered by the Plaintiff and the Class.

619.    Defendants are corporations, companies, partnerships, or other business entities that participated in the illegal course of conduct that is the subject of this action as alleged herein including the creation and inflation of AWPs and the marketing of spreads.

620.    Each of the defendants named above participated in the creation and dissemination of inflated AWPs.

621.     Defendants engaged in conspiratorial meetings, among the purposes of which were to discuss the importance of controlling AWPs, setting inflated AWPs, maintaining inflated AWPs, maintaining AWPs as a basis for prescription drug reimbursement, and impeding efforts by payors to learn the truth, all in an effort to increase their individual profits and market shares at the expense of payors for their drugs, like Local 690 and the Class.

622.     Conspiratorial meetings, conferences, telephone conversations, and other communications were held between and among the defendants, and others (including providers, wholesalers, PBMs and others in the pharmaceutical drug distribution chain), for the purpose of discussing the improper sales and marketing practices set forth herein.

623.     Defendants performed the conspiratorial acts set forth herein intending to injure the end payors of their drugs, like Local 690 and the Class, by causing them to pay artificially inflated prices for defendants' drugs based upon inflated AWPs.

624.     During all relevant times, the defendants knew that the creation and inflation of AWPs was deceptive.

625.     Defendants performed the acts alleged herein in furtherance of the common plan or design for the conspiracy with intent, malice and/or with knowledge of the injury and damage it would cause to the Local 690 and the Class, and with knowledge and intent to cause such injuries and/or with reckless disregard for the consequences.

626.     As a direct and proximate result of the defendants' conduct as alleged herein, Plaintiff and the Class have been injured and damaged, and defendants are jointly and severally liable for such injuries and damages.

WHEREFORE, Plaintiff, on behalf of itself, and on behalf of all similarly situated Pennsylvania consumers and TPPs, respectfully seeks the relief set forth below.

119

## VIII.  <u>AD DAMNUM</u>

WHEREFORE, Plaintiff and the Class demand the following:

  a.  Judgment in their favor, and against all defendants;

  b.  The entry of an Order permanently enjoining each and every defendant from continuing the deceptive and/or unfair acts or practices complained of herein, and requiring corrective measures;

  c.  On behalf of itself and all members of the Class, statutory damages, including treble damages;

  d.  On behalf of itself and all members of the Class, compensatory damages;

  e.  On behalf of itself and all members of the Class, exemplary and punitive damages in an amount to be determined at trial;

  f.  All elements of interest, including but not limited to pre- and post-judgment interest;

  g.  Attorney fees, expert witness fees, costs of investigation, and other reasonably related costs, including court costs, litigation expenses, and fees; and

  h.  Such other and further relief as the Court deems just and appropriate.


Date:  March 29, 2016         Respectfully submitted,

                  */s/ Donald E. Haviland, Jr.*
                  Donald E. Haviland, Jr.
                  PA Attorney I.D. #66615
                  Christina M. Philipp
                  PA Attorney I.D. #92804
                  **Haviland Hughes**
                  201 South Maple Way, Suite 110
                  Ambler, PA  19002
                  (215) 609-4661 telephone
                  (215) 392-4400 facsimile

                  Dion G. Rassias, Esquire
                  PA Attorney I.D. #49724
                  **The Beasley Firm, LLC**
                  1125 Walnut Street
                  Philadelphia, PA 19107
                  Telephone:  (215) 592-1000

**<u>CERTIFICATE OF SERVICE</u>**

I, Donald E. Haviland, Jr., Esquire, hereby certify that on this 29th day of March 2016, I

caused to be served via ECF filing a true and correct copy of the foregoing Amended Civil

Consumer Class Action Complaint on all counsel of record.

<u>*s/ Donald E. Haviland, Jr.*</u>
Donald E. Haviland, Jr., Esquire